

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**May 21, 2019 19:07**

By: ASHLIE CASE SLETVOLD 0079477

Confirmation Nbr. 1716635

GARY BRACK, R.N.                                CV 19 915706

vs.

ARMOND BUDISH, ET AL.                    **Judge:  ASHLEY KILBANE**

Pages Filed:  47

**EXHIBIT**
**1**

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **GARY BRACK, R.N.**<br>15523 Clifton Blvd.<br>Lakewood OH 44107<br>   *Plaintiff,*<br><br> vs.<br><br>**ARMOND BUDISH**, *in his official and individual*<br>*capacities,*<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>**KEN MILLS**, *in his individual capacity,*<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>**CUYAHOGA COUNTY**<br>c/o its Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>**THE METROHEALTH SYSTEM**<br>2500 MetroHealth Drive<br>Cleveland, OH 44109<br><br>**AKRAM BOUTROS**, *in his official and individual*<br>*capacities,*<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br> and<br><br>**JANE PLATTEN**, *in her official and individual*<br>*capacities,*<br><br>▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>    *Defendants.* | Case No.<br><br>Judge |

**COMPLAINT WITH JURY DEMAND**

**NATURE OF THE ACTION**

1. Plaintiff Gary Brack, R.N., was a caring nursing director who was fired for speaking up at a

public hearing about a healthcare crisis that thus far has left a trail of nine corpses at the Cuyahoga

County jail. His candid answers to County legislators triggered malfeasance investigations, a string of public-corruption indictments, and renewed cries for County reform.

2.      But his courage had a cost. The County has a culture of retaliation. So he was punished for his protected speech, and others fear to speak, lest they be made examples, too.

3.      Defendant Armond Budish won his office by promising transparent County governance, but his administration demanded silence. "Stay in your lane, nurse Brack," sneered Defendant Ken Mills, Budish's homophobic, since-indicted, and now-former Director of Corrections, when Nurse Brack raised early concerns about jail-safety issues. "I run the jail," said Mills.

4.      Mills's orders came straight from the top. He faithfully executed Budish's mandate to cut costs at any cost and conceal the deadly consequences from the public. He obstructed nurse hiring at the jail, understaffed the officers who protect them, and parachuted into monthly meetings about MetroHealth's healthcare contract, which was supposed to be managed by the County sheriff. Mills spurned their expertise—he scorned the "faggots in medical" and Sheriff Pinkney alike—and ignored repeated warnings with impunity.

5.      So on May 22, 2018, when the Council summoned Mills to explain the "life and death" healthcare crisis in County jails, Mills perjured himself. He denied any involvement in medical-care issues and his obstruction of MetroHealth's nurse-hiring processes. He did so to hide his malfeasance and protect Budish, whose privatization agenda was well-known, and advanced by turmoil in the medical care Nurse Brack managed. And Mills's loyalty was rewarded by his powerful patron.

6.      Budish didn't fire Mills for his lies.

7.      Mills resigned six months later, just before the U.S. Marshals Service released a report about the inhumane conditions he concealed that have resulted in nine inmate deaths in the past year.

8.      But at Budish's command, Nurse Brack was fired for his truth.

9.      Nurse Brack was present at the May 22 hearing, but MetroHealth, Nurse Brack's employer, ordered him not to speak without permission or criticize its lucrative client. The Council, however, wanted information from someone with personal knowledge.

10.     So after Defendant Platten, MetroHealth's chief of staff, repeatedly diverted questions about Mills's role in medical-care issues, the Council asked Nurse Brack for his opinion about relations with the County, and its role in the healthcare crisis.

11.     Nursing is Nurse Brack's vocation because compassion is his nature, as nurses who knew him wrote in a moving "Letter of Support" they sent to Budish protesting his removal. And Mills had spurned repeated warnings about medical-care issues Nurse Brack raised internally.[1] So Nurse Brack did not limit his speech to the role MetroHealth designated for him. Instead, he spoke as a compassionate and concerned citizen, and answered the Council's questions from personal knowledge.

12.     Nurse Brack's testimony exposed Mills's persistent interference with and disdain for vital matters of inmate health and nurse safety that threatened lives under Nurse Brack's care. His testimony was explicitly personal and remarkably restrained, as his colleagues emphasized when they erupted in protest at his removal. Nurse Brack had a moral and ethical obligation to report problems that interfered with patient care, but he did not complain about Mills's homophobic abuse. Instead, he focused on the issue the Council probed: what was the relationship like between County and MetroHealth partners, and did it interfere with medical care? As he testified, based on his personal opinion, healthcare services were impaired by Mills's flagrant disrespect for Sheriff Pinkney, who

---

[1] Those internal reports were also protected speech. *Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578–79 (6th Cir. 1997); *see also Way v. Shawnee Twp.*, 192 F. Supp. 3d 867, 879 (N.D. Ohio 2016) ("an employee's choice to communicate privately with an employer does not strip the concern of its public nature.").

had been a helpful partner in ameliorating the consequences of Mills's obstruction, and was supposed to be in charge of the MetroHealth relationship.

13.     But Mills was Budish's designee, so Budish was outraged. Rather than address Mills's conduct at the jail, or any of the serious issues Nurse Brack aired, Budish retaliated for exposing his lieutenant's malfeasance and embarrassing his administration.

14.     The next day, Budish and Budish's his chief of staff Earl Leiken drove to MetroHealth to meet with Defendant Boutros, MetroHealth's CEO, and demanded Brack be removed from the jail.

15.     County sources would only confirm this trip anonymously due to fear of reprisal, but as public records memorialize, MetroHealth immediately complied. Then, after summoning Nurse Brack to a meeting, castigating him for speaking beyond his designated role, and drafting a memorandum of Nurse Brack's supposed "violations" to assure Budish that his unconstitutional demand for Nurse Brack's removal had been met, MetroHealth terminated Nurse Brack.

16.     When Nurse Brack asked who ordered his removal, MetroHealth's in-house labor-relations lawyer Emily Fiftal refused to answer. But MetroHealth's CEO Boutros confirmed Budish's demand and Nurse Brack's removal by email to Budish, hoping to preserve MetroHealth's profitable jail contract.

17.     And Budish, for his part, would do it all again. Even as he contracts out County functions, he claims a nonexistent right to suspend First Amendment rights through those very contracts.[2]

18.     Nurse Brack's protected speech cost him his job, but the example made of him harms the public. Criminal indictments have picked off a string of County administrators, but jail employees remain afraid to explain how the Cuyahoga County jail became one of the worst in the nation, because—after Nurse Brack's ousting—they fear retaliation.

---

[2] *Benison v. Ross*, 765 F.3d 649, 663–64 (6th Cir. 2014) (contractual rights do not immunize state actors for exercising them in retaliation for speech).

19.     Nurse Brack brings this lawsuit so that others need not risk their livelihoods to exercise their First Amendment rights, or risk their lives while matters of public concern remain suppressed. The choice is perverse and unconstitutional, for "the First Amendment should never countenance the gamble that informed scrutiny of the workings of government will be left to wither on the vine" by "those who bring, often at some personal risk, its operations into public view."[3]

20.     To protect the nurses, officers, and inmates for whom he still cares, cure a culture of retaliation that hides malfeasance from the public, and vindicate his constitutional rights, Nurse Brack brings this civil-rights action for First Amendment retaliation and prior restraint under 42 U.S.C. § 1983, civil liability for criminal acts, and conspiracy to violate his constitutional and statutory rights.

## PARTIES

21.     Plaintiff Gary Brack, R.N., resides in Cuyahoga County, Ohio, and was MetroHealth's interim director of ambulatory care at the County jail until his removal in retaliation for his protected speech.

22.     Defendant Cuyahoga County is a political subdivision and unit of local government, organized under the laws of the State of Ohio, and acting under color of law. The County is a "person" under 42 U.S.C. § 1983 and was at all relevant times the employer and principal of Defendants Budish and Mills. The County operates the Cuyahoga County Corrections Center ("Corrections Center"), where it is liable for acts and omissions taken under its customs, policies, or practices, and responsible for training and supervising its employees.

---

[3] *Andrew v. Clark*, 561 F.3d 261, 273 (4th Cir. 2009) (Wilkinson, J., concurring) (emphasizing the vital importance of unfettered public-employee speech about "the actual workings—not just the speeches and reports and handouts—of our public bodies.").

23.     Defendant Budish remains, and was at all relevant times, the County Executive for Cuyahoga County, exercising supervisory and policy-making authority for the County, and acting under color of state law. He is sued in his personal and official capacities.

24.     Defendant Mills was hired in 2014 as the County's Director of Corrections to take charge of Budish's plan to regionalize the jails in the county. He resigned in November 2018, days before the U.S. Marshals Service released a report that detailed deplorable conditions inside the Corrections Center, where seven inmates had died since Nurse Brack's removal.  Mills acted at all relevant times under color of state law. He is sued in his personal and official capacities.

25.     Defendant MetroHealth was and "is a county hospital operating under Chapter 339 of the Ohio Revised Code," and "subject to the mandates of the Constitution and 42 U.S.C. § 1983."[4] It is responsible and liable for acts and omissions taken under its customs, policies, or practices, and is responsible for training and supervising its employees.

26.     Defendant Akram Boutros was and is the Chief Executive Officer of MetroHealth, and exercises supervisory and policymaking authority under color of state law. He is responsible for employment actions, including hiring, suspension, reassignment, discipline, and termination. He is sued in his personal and official capacities.

27.     Defendant Jane Platten was and is MetroHealth's chief of staff, exercising supervisory and policymaking authority under color of state law. She is sued in her personal and official capacities.

### JURISDICTION AND VENUE

28.     The Court has jurisdiction because the acts giving rise to the claims occurred in this county and the amount in controversy exceeds $15,000.

29.     The Court has personal jurisdiction over Defendants.

---

[4] *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1132 fn. 1 (6th Cir. 1995).

30.     Venue is proper here because the events giving rise to Nurse Brack's claims took place within this jurisdiction, and all parties reside, work, worked, or are located in this county.

### FACTUAL BACKGROUND

### Nurse Brack was an effective and well-respected Director of Nursing.

31.     Nurse Brack is a registered nurse and medical-services administrator with 20 years' experience. He teaches advanced critical-care nursing at Cuyahoga Community College.

32.     MetroHealth hired Nurse Brack in 2015 to manage its nursing operations for the County. He was hired as Nursing Supervisor because the County refused to create a senior-level management position, but was required to assume director-level responsibilities because there was no one else to perform those tasks.

33.     In December 2017, MetroHealth promoted Nurse Brack to interim director of ambulatory care for the Corrections Center after the County's own director of nursing services had enough of Defendant Mills's virulent homophobia and resigned.

34.     Throughout his tenure at MetroHealth, Nurse Brack was responsible for managing nursing services at the Corrections Center. His primary responsibilities included making nursing schedules, managing daily staff assignments, arranging training and educational in-services for staff, administering staff evaluations and corrective-action plans, handling inmate and family concerns, conducting quality-improvement audits on nursing-medication delivery, conducting inmate-grievance meetings and disciplinary investigations for nursing staff, interviewing and selecting new nursing staff, and coordinating with jail administrators.

35.     Nurse Brack's ordinary job duties did not include making official statements on behalf of the County, the Corrections Center, or MetroHealth. Nor did they include reporting malfeasance, retaliation, or workplace discrimination to the County Council or the public.

36.     Until he spoke at the County Council's May 22, 2018 public hearing, Nurse Brack was never

disciplined by MetroHealth, and was praised for his effective management. He was widely respected

by those with whom he worked, as one County employee recalled in an interview with Cleveland

*Scene*'s Vince Grzegorek:

> Corrections officers loved him. Nurses loved him. He was a leader, which is different
> than being a boss. He put the burden of stress on himself, and he went to council and
> he spoke and he thought he was going to be protected. If they were short staffed, he
> had no shame in doing the low-level jobs of his nurses. If they needed someone to do
> med cart, he was on med cart. If they were short in the dispensary, he was there. If
> you look at our leaders, they sit at their desks, they watch their employees on camera.
> When we're short, they don't help or assist.

37.     Defendant Mills, by contrast, was considered "the worst." "Everyone really disliked him," a

corrections officer explained, because he "never listened to their concerns." Mills "viewed those

concerns as complaining, and he refused many times to take their safety concerns seriously."

38.     Mills's mandate was well-known: "the county wanted so badly to be the regional jail and they

kept biting off more without thinking about housing and staffing and conditions." But Defendant

Budish, who gave Mills his orders, kept his distance from the jail, and his political hands clean. As

one corrections officer anonymously disclosed to *Scene*:

> I've never seen Armond Budish in the building. This guy's a county leader, and I've
> never seen him in the jail. You're running a business, and you're getting called to the
> carpet, wouldn't you say, "I'm going to go over there. I want full access. I want to see
> for myself what's going on. I want to know the truth."

39.     By May 22, 2018, the County Council wanted the truth. But truth was inconvenient—

personally, commercially, and politically—for Defendants, and they wielded power of state

law. So when Nurse Brack spoke truth, they abused their power and retaliated against him—

solely, as their own writings confirm, for the content of his protected speech.

### Nurse Brack endures homophobic discrimination in the workplace.

40.     Nurse Brack's ordeal began long before his removal. As MetroHealth's Nursing Supervisor,

he worked alongside the County's Director of Nursing, Marcus Harris, R.N. They shared an office

and had an effective working relationship. But Nurse Harris resigned in 2017 because Defendant Mills is notoriously homophobic, and Nurse Harris is gay.

41.     Mills frequently made homophobic comments in the workplace about Nurse Brack. In one instance, Mills asked Sheriff's Department Fiscal Officer Donna Kaleal if Nurse Brack and Nurse Harris were lovers. When she stared at him in confusion, Mills elaborated: "They're fucking faggots."

42.     On another instance, Mills stated "I hate those fucking faggots up in medical."

43.     Mills's homophobic bigotry was "widespread," as the County's Agency of Inspector General ("AIG") concluded after "interviewing seventeen witnesses and reviewing numerous documents." The AIG found **"sufficient evidence to indicate Mills likely made discriminatory comments regarding Marcus Harris'[s] and Gary Brack's perceived sexual orientation; and was not sufficiently compliant with the County's continuing commitment to diversity."**[5]

44.     Even after Nurse Harris resigned and retained an attorney, Nurse Brack remained, fighting an uphill, one-man battle to protect the nurses, officers, and inmates in his care.

### Nurse Brack endures Mills's interference with medical care.

45.     Defendant Mills had no formal role in administering the County's medical-services contract with MetroHealth, but his mandate from Budish prevented pushback when he interfered. As Mills was wont to declare, unchallenged, "I run the jail." Mills issued operational directives and attended monthly sheriffs' meetings, where he bragged about how the Corrections Center was underbudget.

46.     As Nurse Brack repeatedly warned, those savings were achieved by dangerous staff cuts that left nurses unprotected. By understaffing corrections officers, Mills created "red zones" on floors where inmates had to remain locked in their cells for up to 27 hours at a time. The noun became a

---

[5] County Inspector General's Report of Investigation (Dec. 31, 2018) ("AIG Report") (attached as Ex. 1) at 1 (boldface italics in original). Mills refused to cooperate with the investigation. *Id.* ("Despite numerous requests over several weeks that he appear for an interview with the AIG, Mills has not done so.").

verb: to be "red-zoned" was a feature of County incarceration, and inmates invented complaints to get to Nurse Brack's clinic, telling nurses that they "just wanted to get out of that cell."

47.     One night, when Nurse Brack was working late, his night nurses received 30 complaints of "chest pain" from inmates on the same floor—an understaffed "red zone" where inmates had been confined to their cells for nearly 24 hours. Nurse Brack raised these concerns with Mills—it was then that Mills told "Nurse Brack" to stay in his "lane," and out of Mills's domain.

48.     Nurse Brack had also reported to Mills deficiencies in mental-health treatment. In 2017, Mills excluded medical staff from participating in "administrative segregation" rounds to a special Corrections Center floor for inmates suffering from mental illness. As Nurse Brack explained, he maintains continuing-education certifications in correctional healthcare, and best practices require adequate medical staffing to address behavioral issues. But Mills smirked. Mills had never attended any of the correctional-healthcare conferences, but again, as he reiterated, "I run the jail."

49.     Budish's mandate gave Mills virtual impunity, and Mills disregarded with contempt concerns raised by County and MetroHealth officials alike. In one instance, an inmate had smuggled an extra bologna sandwich to his cell, and, when apprehended, threw the sandwich at an officer. The officers' response to the indignity was savage. After cuffing the inmate, officers smashed his face so violently into the ground that his front teeth came out his nose, placed him in a restraint chair, and jammed a mask over his broken face to conceal their assault.

50.     Mills's officers refused to let nursing staff remove the mask to assess the inmate's injuries, but a night nurse saw the masked man and requested medical evaluation. Mills's security supervisor refused: "he wants to try and hit one of my officers—he can sit the fuck there for hours."

51.     So the night-shift nurse called Nurse Brack at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the County

waited another half-hour before transporting the man to medical. The mask was lifted, EMS was called, and MetroHealth had to reconstruct a face.

52.     Mills's coverup began immediately. A monthly sheriffs' meeting was scheduled for the next day, at which Mills was, as usual, in attendance. So were Nurse Brack and MetroHealth's Medical Director, Dr. Tallman, who expressed concern about the incident. But Mills knew his loyalty to Budish earned him protection.

53.     Mills smiled at the jail's then-Warden, Eric Ivey, who was later indicted for instructing officers to turn body-cameras off, and lied through his teeth about the inmate who had been beaten: "I reviewed the situation and the officers used appropriate force to the threat of what the inmate was using." When Dr. Tallman asked to view security footage, Mills refused: "I already reviewed it—nothing was done wrong."

54.     This concerned Sheriff Pinkney, who said he would follow up. But when he did, the security and body-camera footage had somehow "disappeared." Mills had pure contempt for the sheriff, even on matters as serious as violent misconduct by corrections officers. With Budish's blessing, and Ivey's assistance, Mills "ran the jail," and acted with impunity.

### MetroHealth restrains Nurse Brack's speech.

55.     By May 2018, healthcare at the County jails was in a state of crisis. Mills had ignored repeated warnings from Nurse Brack, and blocked nurse hiring until the situation grew untenable. Mills was forced to issue a "mission-critical request" to the Council for nurse staffing, so the Public Safety Committee convened a hearing to address it, summoning Mills and MetroHealth administrators to "explain how we had gotten to that point."

56.     MetroHealth had designated Dr. Tallman to attend, and though Dr. Tallman declined on the basis of a scheduling conflict, he worked with Nurse Brack to prepare testimony. The night before

the hearing, they exchanged emails about the hearing, and sent an outline of planned remarks to Defendant Platten.

57.     Before the hearing, however, Platten instructed Nurse Brack not to criticize the County, and directed him not to speak without her advance permission. She did so as his supervisor, effecting MetroHealth's policy to prohibit employees from criticizing the County.

58.     As MetroHealth memorialized in a notice of supposed violations, Platten "had specified to Nurse Brack that it was Platten's role to speak on behalf of MetroHealth at the meeting, and Nurse Brack's role was to help with technical operational questions." She directed Nurse Brack that if he did speak at the meeting he needed to do so diplomatically, and forbade him from saying anything that would damage MetroHealth's relationship with Cuyahoga County.

59.     A reasonable employee in Nurse Brack's position would have been chilled by Platten's orders from criticizing County employees, exposing County malfeasance, or otherwise engaging in protected speech.

60.     But Nurse Brack was made of stronger stuff.

**Nurse Brack engages in protected speech.**

61.     At the May 22 Council hearing, Mills had denied any involvement in nurse-staffing issues. He also claimed that the nurse-staffing crisis was purely fiscal—the County needed more money. Chairman Michael Gallagher asked Mills why the issue had suddenly become "mission-critical," and asked Mills if there were other causes—if, for example, "the folks that are working in the jail, the RNs, the LPMs, medical staff to doctors, Chief Medical Executive, do they have concerns and do they express those concerns to you?" But Mills demurred, falsely claiming ignorance. "I'm not directly related to this, so they don't come to me and talk; they go through their chain of command."

62.     So Chairman Gallagher pressed the point, asking Mills: "so you think the relationship with the staff is OK?" Mills said "Yes." Gallagher's skepticism was evident ("If you're not willing to

answer that's fine because I'll find out. . .") and, noting Dr. Tallman's absence, he sought someone with direct knowledge.

63.     Defendant Platten promptly introduced herself and Nurse Brack, but Chairman Gallagher skipped her, asking Nurse Brack directly about staff relations. Nurse Brack truthfully explained that Mills had obstructed nurse hiring, and that relationships with him were not good. As Chairman Gallagher summarized, "you're saying it's not necessarily a dollar figure that's part of the problem?" Nurse Brack acknowledged that pay issues were important, but emphasized communication issues and prior fruitless attempts to address issues that had been repeatedly reported to Mills.

64.     Mills, Nurse Brack explained, involved himself in monthly sheriffs meetings about medical operations, had received complaints about issues affecting the provision of medical care, and made decisions that compromised inmate healthcare without consulting medical staff.

65.     When Chairman Gallagher asked Mills if he had blocked nurse hiring, Mills denied itAnd Platten, who repeatedly interjected to minimize Mills's role, promptly backed him up with an empty formalism. She didn't interact with Mills, she said, because "he doesn't have management over the medical staff," and by contract, the sheriff was responsible for MetroHealth's provision of medical services at the jail.

66.     Councilwoman Yvonne Conwell pressed Mills, however, on his involvement with medical services. Mills claimed, again, that he was uninvolved with medical staffing, but admitted his responsibility for jail operations. So Councilwoman Conwell asked Nurse Brack to approach the microphone and describe relations with Mills regarding operations and security.

67.     Nurse Brack reiterated truthfully that relations with Sheriff Pinkney were excellent, but Mills's interference was problematic, and Mills exercised improper authority over medical services that compromised health and safety at the jail. The problem, Nurse Brack explained, was that Mills had no respect for the Sheriff's duly appointed role:

Part of that, and this is my personal opinion, but the level of disrespect I see in these meetings by Ken Mills to the sheriff, the eye-rolling, the body language, the body movements, I've never, in my professional career witnessed that. I think that there's a total disrespect for the sheriff's position within the correctional center, honestly.

**The County retaliates against Nurse Brack for his protected speech.**

68.     On May 23, 2018, the day after the Council hearing, Defendant Budish and his chief of staff

Earl Leiken drove to MetroHealth for an in-person meeting about Nurse Brack. They met with

Defendants Boutros and Platten and demanded that Nurse Brack be terminated.

69.     Defendants were motivated to retaliate against Nurse Brack for the content of his protected

speech. As MetroHealth confirmed in writing, the County immediately requested that Nurse Brack

be removed from his role at County Corrections. On May 25, 2018, three days after the hearing,

Defendant Boutros wrote a simpering email to affirm his compliance with Budish's demand:

> Executive Budish,
>
> Thank you for meeting with us this past Wednesday to discuss the jail medical program. As we discussed, MetroHealth is committed to our partnership with Cuyahoga County in providing the highest quality medical services at the main corrections center and it's [*sic*] regional facilities. . . .
>
> As per your request for MetroHealth to immediately remove our Nurse Supervisor employee from the jail clinic, we have made the adjustment to our staffing model and as of May 28, 2018 the employee will no longer provide services at the jail clinic. . . . . Thank you, Armond. Again, we are committed to our partnership and look forward to continuing to work together.
>
> Regards,
> Akram[6]

70.     On May 25, 2018, two days after Budish and Mills drove to MetroHealth to demand Nurse

Brack's removal, MetroHealth complied. Nurse Brack was stripped by that government entity of his

management position and placed on administrative leave.[7]

---

[6] Boutros email to Budish, Pinckey, Leiken, and Platten (May 25, 2018) (attached as Ex. 2).

[7] MetroHealth demanded that Nurse Brack select one of two demotions before June 2, 2018, but when informed that Nurse Brack had been requested to provide an FBI interview, abandoned the ultimatum and offered to provide him with counsel.

71.     And, the County claimed—falsely, insofar as it ignored the Constitution—that it was required to comply with the County's demand as "a contracted service provider."[8] MetroHealth candidly admitted its motive in targeting Nurse Brack's protected speech: it had caused "immediate damage to MetroHealth's relationship with Cuyahoga County," and required "immediate attention and renewed commitments from members of MetroHealth's executive leadership."

72.     In a two-page, single-spaced memorandum to supplement Defendant Boutros's email to Budish and assuage MetroHealth's profitable client, MetroHealth set out in no uncertain terms its retaliatory motive for removing Nurse Brack from the jail. Nurse Brack was still on leave, but MetroHealth summoned him to a meeting with its labor lawyer, Emily Fiftal, and two other senior administrators, and required to sign the putative notice of employment violations (the "Removal Memorandum").[9]

73.     The Removal Memorandum opened with a "Description of violation," and confirmed that MetroHealth removed Nurse Brack for his protected speech at the May 22, 2018 Council meeting. In black letters, it confirmed every element of Nurse Brack's First Amendment retaliation claim.

74.     First, the Removal Memorandum confirmed that Nurse Brack spoke in his personal capacity and not in the ordinary scope of his duties. "In a scenario that Mr. Brack does not generally encounter in the ordinary scope of his duties," it opened, "Mr. Brack's very negative comments about MetroHealth's relationship with the County were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations."[10]

---

[8] Removal Memorandum (June 4, 2018) (attached as Ex. 3) at 1.

[9] *Id.*

[10] This resolves any issue under *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Lane v. Franks*, 134 S.Ct. 2369 (2014) as to whether Nurse Brack's speech was protected against retaliation. *See Mayhew v. Town of Smyrna, Tennessee*, 856 F.3d 456, 464 (6th Cir. 2017) ("Although *Garcetti* carves out an exception to First Amendment protection for speech that 'owes its existence to a public employee's professional responsibilities,' this exception 'must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment.' Or, in *Lane*'s words, 'the critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns

75.    Second, it confirmed that Nurse Brack spoke on a matter of public concern—his knowledge of mismanagement and obstruction by Mills, and his disrespect for officials charged with vital public functions.[11] "In a public meeting of the Cuyahoga County Council Public Safety and Justice Affairs Committee," it proceeded, "Mr. Brack was asked to describe the relationship between MetroHealth and Cuyahoga County regarding the clinical operations at County Corrections." Criticism of official conduct and unauthorized action by public officials, particularly involving matters of health and safety, is quintessentially of public concern, and the County Council was specifically interested in the subjective character of the relationship between County officials and nursing staff, because it affected nurse-hiring, retention, and clinical operations generally. But the Removal Memorandum faulted Nurse Brack for providing that very information—for noting that Mills threw his weight around in meetings where he lacked proper authority, and for "using highly negative and subjective terms" to characterize Mills's conduct in the discharge of his official responsibilities. And it was signed by a lawyer for a public healthcare provider who should have known that "When an institution oversees some aspect of public safety, the correct operation of that institution is a matter of public concern," and "the interest in public safety outweighs the state's interest in conducting its affairs collegially."[12]

76.    Third, the Removal Memorandum confirmed retaliatory motivation, both on the County's part, and on MetroHealth's. The County's problem was that Nurse Brack's criticisms were "personally offensive" to Mills, and Budish "immediately requested" his removal. MetroHealth's

---

those duties.'") (cleaned up; citations omitted); *see also Allard v. Michigan House of Representatives*, 200 F. Supp. 3d 703, 709–10 (W.D. Mich. 2016) (speech was made in personal capacity because it "accus[ed] . . . supervisors of malfeasance.").

[11] Mills was later indicted for the lies Nurse Brack exposed, but the First Amendment does not "limit reports of wrongdoing to illegal acts, for a public concern includes any matter of political, social, or other concern to the community." *Mayhew*, 856 F.3d at 469 (cleaned up). This includes "mismanagement by public employees." *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 544 (6th Cir. 2012).

[12] *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002).

problem was reputational and financial: Nurse Brack's truthful public testimony harmed
MetroHealth's relationship with Budish, its "reputation" and "key relationships" and required
remedial attention to preserve a profitable contract. Indeed, for that very reason, Nurse Brack had
been specifically "coached" by Platten, who unconstitutionally forbade him from criticizing the
County, even as she tried to ensure he was to have no substantive speaking role, and instructed him
to alter his truthful testimony about misconduct to be "diplomatic."

77.     County Communications Director Mary Louise Madigan confirmed to media that the
County requested Nurse Brack be replaced and did so in retaliation for his truthful speech.

78.     Those commitments are public record. These public officials were operating with such
impunity that they frankly disclosed and confirmed in writing that they were retaliating against Nurse
Brack for his protected speech on May 22, 2019.

79.     Nurse Brack asked who at the County demanded his removal, but MetroHealth's attorney
for labor relations, Emily Fiftal, refused to tell him, saying "I don't know that we have to tell you
nor do we at this point want to tell you." But Budish's role was no great secret.

### The County's culture of retaliation is well known.

80.     The swift and vindictive backlash against Nurse Brack was consistent with the the County's
culture of retaliation. Budish's desire to avoid embarrassment was well-known, as was his solicitude
for Mills. In but one example, in December 2018, when Sherriff Pinkney was asked to testify before
the Council about who at the County had reached out to an unbid vendor, Naph Care, to explore
privatization options for medical care at the Corrections Center, Pinkney falsely disclaimed
knowledge. He knew it was Mills, but feared Budish.

81.     Afterwards, Pinkney explained to Nurse Brack that he was worried Budish would be "ticked
off" if he identified Mills. Budish had specifically instructed Pinkney to be "politically correct," and
Pinkney knew Budish would retaliate if Pinkney's testimony embarrassed Budish or Mills, telling

Nurse Brack, "I talked with Budish and I can't just throw Mills under the bus to humiliate Budish."
The sheriff had frequently voiced his dislike for Mills to Nurse Brack, but said he was powerless to
correct Mills's interference because of Budish.

### Other public employees protest Nurse Brack's removal.

82.     Two days later, on June 6, 2018, several of Nurse Brack's colleagues at the VA (where he
worked part-time) drafted and sent Budish a heartfelt "Letter of Support" protesting the County's
retaliation against Nurse Brack. His colleagues expressed "disappointment and concern regarding
the County's response to Gary Brack after the Public Safety and Justice Affairs Meeting," and
insisted that the County make amends. The VA nurses found it "distressing" that the County treated
Nurse Brack's warnings as evidence of a lack of trust. As a nurse, they explained, Nurse Brack was
ethically obligated to speak up about issues that might harm his patients, and "morally obligated to
report problems."

83.     Nurse Brack "championed courage and brought clarity to problems the jail is facing where
others could not or would not take that risk," the letter explained. "We insist that Cuyahoga County
not promote a culture of fear while claiming to want trust."

### MetroHealth terminates Nurse Brack's employment.

84.     Nures Brack remained in limbo on administrative leave as he was subpoenaed to testify in
state and federal criminal investigations involving official malfeasance at the jail. On June 29, 2018,
the undersigned counsel informed MetroHealth of Nurse Brack's claims for First Amendment
retaliation and workplace discrimination and requested MetroHealth take no further action against
Nurse Brack, warning that holding his discharge over his head, particularly while he was asked to
provide investigators with information about his employment, amounted to further retaliation.

85.     On July 10, 2018, MetroHealth's general counsel Laura McBride responded, stating that
MetroHealth would be terminating Nurse Brack's paid leave if he did not accept other non-director

roles (or serve as a staff nurse) while he explored options. None of the roles MetroHealth offered were equivalent to his previous director-level responsibilities.

86.     By letter dated August 29, 2018, MetroHealth terminated Nurse Brack's employment.

## CLAIM 1
### CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1983
#### (AGAINST ALL DEFENDANTS)

1.     Plaintiff incorporates all previous allegations.

2.     Defendants' acts detailed above constitute a conspiracy to violate Nurse Brack's constitutional rights.

3.     Defendants came to a mutual agreement and understanding to remove Nurse Brack from his position in retaliation for his protected speech. In furtherance of this conspiracy, Defendants undertook the acts detailed above, which would not have been undertaken without the agreement. Those included removing Nurse Brack from his role in the jail and then constructively discharging him through threatened demotion.

4.     Nurse Brack's constitutional rights were violated as a result of this conspiracy, causing him irreparable harm.

5.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendants are liable.

6.     Defendants acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 2
### FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
#### (AGAINST ALL DEFENDANTS)

87.     Plaintiff incorporates all previous allegations.

88.     Nurse Brack was a public employee who engaged in protected activity by providing internal reports of wrongdoing and public testimony before the County Council, and providing testimony to

federal and state investigators, on matters of public concern when that speech was not part of his ordinary job duties. In speaking out, Nurse Brack engaged in constitutionally protected activity under the First and Fourteenth Amendments.

89.     Defendants knew Nurse Brack had engaged in protected speech, but took adverse actions against him, including making caustic remarks and expressing hatred in the workplace, creating and circulating a notice of putative employment violations, and constructively discharging him.

90.     Nurse Brack's First Amendment-protected speech was a substantial or motivating factor in the adverse actions he suffered at Defendants' hands.

91.     Defendants lack any countervailing interest that outweighs Nurse Brack's interest in speaking out on the above-mentioned matters, or the public's interest in knowing about mismanagement at the County jail.

92.     The contours of Nurse Brack's rights to speak on matters of public concern as a private citizen were sufficiently clearly established at the time he exercised them to apprise Defendants that retaliating against him for exercising those rights was unlawful.

93.     Defendants retaliated against Nurse Brack under color of state law. Budish retaliated against Nurse Brack by demanding that MetroHealth remove him from his position at the jail.[13] MetroHealth, Boutros, and Platten retaliated against Nurse Brack by doing Budish's bidding as described above.

94.     Mills spurred Budish to retaliate.

95.     As a direct and proximate result of Defendants' retaliation, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable,

---

[13] *See Larry v. Powerski,* 148 F.Supp.3d 584 (E.D. Mich. 2015) ("the substance of the plaintiff's retaliatory harassment allegations present entirely free-standing claims for relief that would be actionable against Powerski individually even if the hospital never had acted on Powerski's termination recommendation.").

including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

96.     Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

## CLAIM 3
### LOCAL-GOVERNMENT LIABILITY FOR FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983 (AGAINST THE COUNTY AND METROHEALTH)

97.     Plaintiff incorporates all previous allegations.

98.     Defendants Budish, Mills, Boutros, and Platten are or were sufficiently empowered public officials that their acts constitute the customs, policies, and practices of the County and MetroHealth, respectively. By creating and accepting memoranda that purported to justify retaliation against Nurse Brack for criticizing mismanagement and malfeasance by Mills, Defendants implemented and ratified a policy of retaliating against employees who criticize County administrators.

99.     As a direct and proximate result of this unconstitutional policy, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which the County and MetroHealth are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

## CLAIM 4
### UNLAWFUL FIRST AMENDMENT PRIOR RESTRAINT UNDER 42 U.S.C. § 1983 (AGAINST METROHEALTH, BOUTROS, AND PLATTEN)

100.    Plaintiff incorporates all previous allegations.

101.    MetroHealth, through its sufficiently empowered policymakers, imposed and ratified orders prohibiting Nurse Brack from responding honestly to questions from legislators if his responses were harmful to MetroHealth's reputation or would embarrass the County. MetroHealth, Boutros,

and Platten purported to require Nurse Brack to seek permission before speaking, and forbade him from criticizing the County.

102.    As a direct and proximate result of these Defendants' prior restraints on Nurse Brack, he has suffered and will continue to suffer economic and non-economic damages in an amount to be determined at trial.

103.    Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

### CLAIM 5
### LOCAL-GOVERNMENT LIABILITY FOR PRIOR RESTRAINT UNDER 42 U.S.C. § 1983
### (AGAINST METROHEALTH)

104.    Plaintiff incorporates all previous allegations.

105.    Defendants Budish, Mills, Boutros, and Platten are or were sufficiently empowered public officials that their acts constitute the customs, policies, and practices of the County and MetroHealth, respectively. By memorializing Platten's directives through counsel, and retaliating against Nurse Brack for violating them, MetroHealth ratified a policy of imposing advance restrictions on employee criticisms of County malfeasance, effecting a prior restraint on protected public-employee speech.

106.    As a direct and proximate result of this unconstitutional policy, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

107.    Defendants' acts under this policy were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from adopting such unlawful policies.

## CLAIM 6
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—INTERFERING WITH CIVIL RIGHTS UNDER R.C. 2307.60 AND 2921.45
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

108. Plaintiff incorporates all previous allegations.

109. Under R.C. 2921.45 (Interfering with Civil Rights), no public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right. This provision carries a criminal penalty.

110. Under R.C. 2307.60 (Civil Liability for Criminal Acts), anyone injured in person or property by a criminal act may recover full damages in a civil action.

111. The individual defendants are public servants. Under color of their office, employment, or authority, each knowingly deprived Nurse Brack of his constitutional and statutory rights as detailed above, including his right to be free from retaliation for speaking on matters of public concern as a private citizen.

112. As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

113. Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 7
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60 AND 2923.03 TO INTERFERE WITH CIVIL AND STATUTORY RIGHTS UNDER R.C. 2921.45
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

114. Plaintiff incorporates all previous allegations.

115. Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following.

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the

    Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

116.    This provision carries a criminal penalty.

117.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

118.    Defendants were engaged in complicity to interfere with Nurse Brack's civil and statutory rights.

119.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

120.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 8
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—OBSTRUCTING OFFICIAL BUSINESS UNDER R.C. 2921.31 AND 2307.60
### (AGAINST DEFENDANTS BUDISH, MILLS, AND BOUTROS)

121.    Plaintiff incorporates all previous allegations.

122.    Under R.C. 2921.31, it is unlawful "to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."

123.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

124.    Defendants Mills and Budish intentionally interfered with Nurse Brack's discharge of his duties as interim director of ambulatory care, including by intentionally understaffing corrections officers, interfering with nurse hiring, and demanding (and in Mills's case causing Budish to demand) that MetroHealth remove Nurse Brack from those responsibilities for criticizing Defendant Mills.

125.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

126.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 9
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60 AND 2923.03 TO OBSTRUCT OFFICIAL BUSINESS UNDER R.C. 2921.31 (AGAINST ALL INDIVIDUAL DEFENDANTS)

127.    Plaintiff incorporates all previous allegations.

128.    Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for the commission of an offense, shall do any of the following.

> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

129.    This provision carries a criminal penalty.

130.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

131.    Defendants were engaged in complicity to obstruct official business.

132.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

133.    Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 10
### (ALTERNATIVE CLAIM)
### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—RETALIATION BECAUSE PUBLIC SERVANT DISCHARGED HIS DUTIES
### UNDER R.C. 2307.60 AND 2921.05
### (AGAINST ALL DEFENDANTS)

134.    Plaintiff incorporates all previous allegations.

135.    Under R.C. 2921.05, no person, purposely and by unlawful threat of harm to any person or property, shall retaliate against a public servant because the public servant discharged his duties. The provision carries a criminal penalty.

136.    Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

137.    If the Court determines that Nurse Brack's speech was in the course of discharging his duties and not speaking in his capacity as a citizen—which it should not, then Defendants retaliated against Nurse Brack for discharging his duties.

138.    This retaliation involved ratifying homophobic harassment, threatening disciplinary action, and ordering and/or constructively terminating and then terminating Nurse Brack.

139.    As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

140.     Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial

sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 11
### (ALTERNATIVE CLAIM)
#### CIVIL LIABILITY FOR CRIMINAL ACTS UNDER OHIO LAW—COMPLICITY UNDER R.C. 2307.60 AND 2921.05 TO RETALIATION BECAUSE PUBLIC SERVANT DISCHARGED HIS DUTIES
#### (AGAINST ALL DEFENDANTS)

141.     Plaintiff incorporates all previous allegations.

142.     Under R.C. 2923.03 (Complicity), no person, acting with the kind of culpability required for

the commission of an offense, shall do any of the following.

> (1) Solicit or procure another to commit the offense;

> (2) Aid or abet another in committing the offense;

> (3) Conspire with another to commit the offense in violation of section 2923.01 of the
>     Revised Code;

> (4) Cause an innocent or irresponsible person to commit the offense.

143.     This provision carries a criminal penalty.

144.     Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full

damages in a civil action.

145.     If the Court determines that Nurse Brack's speech was in the course of discharging his

duties and not speaking in his capacity as a citizen—which it should not, then Defendants were

engaged in complicity to retaliate because a public servant was discharging his duties.

146.     This retaliation involved ratifying homophobic harassment, threatening disciplinary action,

and ordering and/or constructively terminating and then terminating Nurse Brack.

147.     As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will

continue to suffer economic and non-economic damages for which Defendants are liable, including,

but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

148.     Defendants' acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

### CLAIM 12
### (ALTERNATIVE CLAIM)
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### (AGAINST METROHEALTH)

149.     Plaintiff incorporates all previous allegations.

150.     Clear public policies exist regarding protecting those in government custody from foreseeable harm, permitting County Council to gather facts and receive information regarding its areas of legislative and oversight responsibility, providing adequate medical care to inmates, and related policies.

151.     Nurse Brack's dismissal was motivated by his raising the alarm about the manifest dangers of the jail mismanagement under Mills. If the Court determines that Nurse Brack was not protected by any of the causes of action above, dismissing or constructively discharging an employee under the circumstances described above would jeopardize each of those public policies.

152.     MetroHealth had no legitimate business justification for constructively discharging Nurse Brack.

153.     As a direct and proximate result of this unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for which MetroHealth is liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages, and benefits, and other terms, privileges, and conditions of employment.

154.     Defendant's acts were wanton, willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 13
## (ALTERNATIVE CLAIM)
### CIVIL CONSPIRACY TO WRONGFULLY TERMINATE NURSE BRACK
### (AGAINST DEFENDANTS BUDISH, MILLS, AND THE COUNTY)

155.    Plaintiff incorporates all previous allegations.

156.    Defendants Budish, Mills, and the County maliciously worked together with MetroHealth to effectuate Nurse Brack's wrongful termination in violation of public policy.

157.    As described above, one or more Defendants committed overt acts in furtherance of the conspiracy acting purposefully without reasonable or lawful excuse.

158.    As a direct and proximate result of Defendants' unlawful conduct, Nurse Brack has suffered and will continue to suffer economic and non-economic damages for with these Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, loss of salary, wages, and benefits, and other privileges and conditions of employment.

159.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Budish, Mills, and others from engaging in this type of unlawful conduct.

### PRAYER FOR RELIEF

For the reasons stated above, Nurse Brack respectfully requests the following relief from the Court:

A.    Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

B.    Enter judgment in Plaintiff's favor on all claims for relief;

C.    Enjoin Defendants from engaging in First Amendment retaliation or otherwise encroaching on civil and constitutional rights;

D.    Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that he has suffered and is reasonably certain to suffer in the future;

E.    Award Plaintiff punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

F.    Award pre-judgment and post-judgment interest at the highest lawful rate;

G.    Award Plaintiff his reasonable attorneys' fees (including expert fees) and all other costs of this suit;

H.    Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable just, or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

*/s/ Ashlie Case Sletvold*
Subodh Chandra (0069233)
Ashlie Case Sletvold (0079477)
Brian Bardwell (0098423)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Gary Brack*



**CUYAHOGA COUNTY**
**AGENCY OF INSPECTOR GENERAL**

### REPORT OF INVESTIGATION

| | |
|---|---|
| **CASE NUMBER:** | 18-0050-I |
| | |
| **SUBJECT(S) INFO:** | Kenneth Mills, Former Regional Director of Corrections |
| **COUNTY DEPARTMENT:** | Cuyahoga County Sheriff's Department |
| | |
| **SOURCE OF REFERRAL:** | Cuyahoga County Human Resources Department |
| **METHOD OF REFERRAL:** | Email |
| **INITIATED:** | September 24, 2018 |
| **DATE OF REPORT:** | December 31, 2018 (amended January 8, 2019) |

## I. Summary

The Cuyahoga County ("County") Agency of Inspector General ("AIG") received notice that Regional Director of Corrections Kenneth Mills was potentially engaging in discriminatory comments and behavior in the workplace. Following requests from the Law Department and Human Resources, the AIG investigated the allegations. Consistent with its requirement to avoid interfering with investigations by other government entities, the AIG temporarily suspended its proceedings during the pendency of an investigation by the US Marshal's service.

After interviewing eighteen witnesses and reviewing numerous documents, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments regarding Marcus Harris' ("Harris") and Gary Brack's ("Brack") perceived sexual orientation; and was not sufficiently compliant with the County's continuing commitment to diversity.* Despite numerous requests over several weeks that he appear for an interview with the AIG, Mills has not done so.

The AIG investigation confirmed three witnesses who reported first-hand knowledge of Mills' discriminatory comments. Further, other County employees reported as to widespread commentary in the workplace regarding similar comments allegedly made by Mills. These secondary reports are given little or no weight as to Mills' personal conduct. Nonetheless, the reports by secondary sources are reported because they were widely-disseminated and reflect – at minimum – the need for the County to re-double its current efforts to support a Culture of Respect. It is also indicative of the need to protect whistleblowers from the fears of retaliation for reporting such conduct. The AIG did not find sufficient direct evidence to support claims that Mills made anti-semitic comments.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action specific to Mills. The AIG, however, recommends that the County expand its training and educational efforts that will reinforce the County's commitment to supporting a Culture of Respect.

**EXHIBIT**

**1**

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 2 of 14

# II. Background

## A. *Cuyahoga County Sheriff's Department*

According to its website the mission of the Sheriff's Department is as follows:

> Our mission as caretaker of the public's safety is dedicated to maintaining the trust and respect of those we serve by resolutely and aggressively enforcing the law and by committing ourselves to the efficient and effective delivery of safety services. As agents of the community, we strive to provide appropriate custodial care along with programs that support the physical, spiritual and constitutional needs of individuals committed to our custody. Further, every effort will be made to assist the inmates in our custody to understand and take responsibility for their involvement in the justice system.

The Department has several divisions – Civil, Law Enforcement and Corrections.  The County Sheriff is Clifford Pinkney.

## B. *Cuyahoga County Sheriff's Department – Corrections Division*

According to the Corrections webpage, the County Corrections Center ("CCC") is the second largest Jail in the state and is a full-service Jail serving over 26,000 inmates annually.

During the course of the investigation, AIG staff learned that there are currently three locations, Downtown, Euclid, and Bedford. The Downtown Jail, which is the primary facility, consists of two high rise buildings housing all levels of security statuses, from maximum security to weekenders.

The CCC operates a full-service Kitchen, Medical Clinic and Pharmacy and provides Social Service programing, all managed by a staff of over 700 employees. CCC partners with MetroHealth for medical care.

The CCC is managed by a Regional Director of Corrections, a Warden, three Associate Wardens, Facility Services Manager, Mental Health Services Manager, and Health Care Services Director. The daily operations are managed by sergeants who oversee Corporals and a complement of approximately 550 Corrections Officers.

Electronically Filed 05/21/2019 19:01 / / COMPLAINT / CV 19 915920 / Confirmation Nbr. 1716365 / CLJK1
Cuyahoga County Office of the Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 3 of 14


## C.  Kenneth Mills

Kenneth Mills ("Mills") was employed by the County for four years. Mills began working at the County in 2014 as Director of Public Safety and Justice.  In 2015, he transitioned to Regional Director of Corrections where he served until his resignation on November 15, 2018.

Mills resigned before AIG staff had an opportunity to interview him.  Subsequently, AIG staff attempted to contact Mills and his legal counsel multiple times – by telephone, regular mail, and certified mail.  In response, Mills left a voicemail indicating that he needed to consult with legal counsel as to whether he would be willing to speak with the AIG.   After his voicemail, communications were directed only to Mills' legal counsel.  However, despite multiple efforts, the AIG was not able to interview Mills.

| DATE | CONTACT TYPE | NUMBER/EMAIL/ ADDRESS | NOTES |
|---|---|---|---|
| November 19, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Telephone to Mills' number in personnel file. | | Line ringing – then fast beeping – could not leave a message. |
| November 27, 2018 | Regular USPS to Mills' address in personnel file. | | |
| November 27, 2018 | Certified USPS to Mills' address in personnel file. | | Return receipt received by AIG December 11, 2018. |
| December 12, 2018 | Telephone – Voicemail from Mills. | | Mills left a voicemail message for IG stating he needed to discuss AIG request with attorney. |
| December 13, 2018 | Telephone to Mills' cell phone number. | | AIG obtained Mills' cell phone number and called to request contact information for attorney. |
| December 13, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. | | AIG staff left a message with Attorney Spellacy's assistant. |
| December 13, 2018 | Email to Mills' attorney Kevin Spellacy – requesting interview with Mills no later than December 21, 2018. | | |
| December 13, 2018 | Certified USPS to Mills' attorney Kevin Spellacy at his office - requesting | | Return receipt received by AIG December 19 or 20, 2018. |

Cuyahoga County Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 4 of 14

| | interview with Mills no later than December 21, 2018. | | |
|---|---|---|---|
| December 14, 2018 | Telephone – Voicemail from Mills' attorney Kevin Spellacy. | | Spellacy left a voicemail for AIG staff returning AIG call. |
| December 18, 2018 | Telephone - Message left for Mills' attorney Kevin Spellacy at his office. | | AIG staff left a message with Spellacy's assistant. |

As of the date of this report, the AIG has received no affirmative or negative response from Mills or his attorney regarding its request for an interview with Mills. Accordingly, there is no interview of Mills in this report.

## D.  Investigation

### 1.  Written and Electronic Documents Reviewed by AIG in the Course of this Investigation

- Letter from Gary Brack's Attorney, Subodh Chandra
- Kenneth Mills Emails from 1/1/18 - 9/20/18
- Kenneth Mills Emails from 1/1/17-12/31/17
- Kenneth Mills HR Personnel File, Job Description, Disciplinary File
- Cuyahoga County Ethics Code
- Cuyahoga County Employee Handbook

### 2.  Interview of Gary Brack – May 30, 2018

Prior to this interview, Brack was the interim Nursing Director at the County Jail. Brack was employed by MetroHealth but worked with the three County jails: the downtown jail location, the Euclid jail location, and the Bedford Heights location. Brack started working with County jails in September of 2016, as a Nursing Supervisor. He also took on administrative duties such as scheduling and grievances. When Nursing Director, Harris, resigned from his position, Brack became the interim Nursing Director until MetroHealth pulled him from working at the County jail.

During an interview with AIG staff, Brack indicated that he had received reports of discriminatory comments and behavior by Mills. In April 2018, Brack was told by Employee-1 ("Employee-1") that Mills asked Employee-1 "if Gary [Brack] and Marcus [Harris] were fucking". According to Employee-1, Mills then said, "I hate fucking faggots" when she asked why he cared. When asked about any other discriminatory behavior on the part of Mills, Brack also mentioned that when discussing a budgeting concern, Mills purportedly made anti-semitic comments to Employee-1 regarding County Executive Armond Budish ("Executive Budish").

Cuyahoga County Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 5 of 14

### 3. Interview of Employee-1 – October 1, 2018 and November 16, 2018

Employee-1 ("Employee-1") has been employed by the County Sheriff's Department ("Sheriff's Department") in the Fiscal Office ("Fiscal") for ten (10) years. Employee-1 has six direct reports and reports directly to senior leaders in the Sheriff's Department.

During the interview, AIG staff asked Employee-1 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-1 gave the following examples:

1. Employee-1 stated that in 2017 when she and Mills were discussing Harris' mileage reimbursement request (that Mills did not want to sign), Mills asked her "You do know they're lovers? They are faggots". Employee-1 stated that Mills may have said "fucking faggots", but was not certain;

2. Employee-1 stated that in 2017 when she and Mills were discussing requesting more money for cameras in the jail, Mills told her the "You know the Executive is not going to give you any more money, he's a Jew";

3. Employee-1 stated that in 2017 Mills told Employee-1 that an African-American sergeant is an inadequate employee. Employee-1 then asked how she got her job, and Mills pointed to his arm as though he meant skin color;

4. In 2017 Employee-6 told Employee-1 that one of nurses intended to file a sexual harassment complaint against Mills; and

5. Employee-1 stated Mills told her the Sheriff thinks he is untouchable because he is the first African-American Sheriff.

Employee-1 noted that Mills always made these comments when there were no other witnesses.

When asked if she ever made a formal report regarding Mills' comments, Employee-1 stated she was reluctant to report due to a fear of retaliation and when Brack was terminated her fears were confirmed.

### 4. Interview of Employee-2 – October 23, 2018

Employee-2 ("Employee-2") is a senior manager in the County Office of Budget and Management ("OBM"). Employee-2 also advises the County Executive and County Council on budget-related matters.

According to Employee-2, no one from the Sheriff's Department reports directly to OBM, but Employee-2 and her team work with Employee-1. OBM, however, does make budget restriction recommendations.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 6 of 14

Employee-2 stated that she believes there was a personality conflict between Mills and Employee-1.

During the interview, AIG staff asked Employee-2 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-2 gave the following examples:

1. Mills told Employee-2 that Employee-4 and Sheriff Pinkney were stupid, lazy, and did not want to manage the jail;

2. Mills told Employee-2 that Sheriff Pinkney was only appointed because he is black;

3. Mills made an anti-homosexual comment in Employee-2's office. Employee-2 does not remember exactly what he said but she stated her belief that Mills' comments indicated that he "does not like homosexuals"; and

4. Mills stated that he thought Harris and Brack were dating.

Employee-2 noted that these comments were not made in the presence of other witnesses.

## 5. Interview of Sheriff Clifford Pinkney – October 4, 2018

Sheriff Pinkney has been employed with the County Sheriff's Department since 1991. Sheriff Pinkney has held the following positions: deputy sheriff, deputy sergeant, lieutenant, Chief Deputy Sheriff, and in 2015 became the Sheriff. As County Sheriff, Pinkney's job duties include overseeing the Sheriff's Department office operations, as well as developing and maintaining partnerships with stakeholders, in the community, and with other law enforcement entities. Sheriff Pinkney reports to Executive Budish. Sheriff Pinkney's direct reports include Employee-4, Special Assistant to the Sheriff, Director of Regional Corrections, Business Services Manager, Medical Director, and other Sheriff personnel as necessary.

During the interview, AIG staff asked Sheriff Pinkney if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Sheriff Pinkney gave the following examples of complaints he had received:

1. Employee-1 told Sheriff Pinkney that Mills made comments about Brack and Harris' sexuality;

2. Employee-1 told Sheriff Pinkney that Mills made comments about working for African Americans – something to the effect of "they are lazy" and he would not enjoy working for two African Americans if George Taylor took the Chief job;

3. Employee-1 told Sheriff Pinkney that Mills made a derogatory comment about Executive Budish being Jewish and therefore cheap;

4. There was a rumor that Mills did not like women or African Americans;

Electronically Filed 05/21/2019 16:04:01 / COMPLAINT / CV 19 915351 / Confirmation Nbr. 1702351 / CLJRK1

Cuyahoga County Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 7 of 14

5. Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women. In fact, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist"; and

6. Employee-6 told Sheriff Pinkney the nurses complained about Mills' behavior but were afraid to come forward due to the possibility of retaliation from Mills.

The Sheriff stated he did not take action on Employee-1's statements because he had no proof other than Employee-1's allegations and he knew Employee-1 and Mills had a strained relationship. Furthermore, he did not take action on the other information because they were informal "gripes" and he had no evidence or specific information.

### 6. Interview with Employee-3 – October 15, 2018

Employee-3 ("Employee-3") was a day shift charge nurse in the main dispensary. Employee-3 recently resigned from the County and is moving to work in a federal prison. At the time of the interview, Employee-3 had worked for the County for almost 15 years. Employee-3's duty as charge nurse was to oversee all staff nurses, be responsible for day-to-day operations in the dispensary, and respond to emergencies.

During the interview, AIG staff asked Employee-3 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-3 gave the following examples:

1. There was discussion among corrections officers ("CO") that Mills sent an email that said, "that fucking faggot" (referring to Harris) "is never going to tell me what to do"; and

2. It was believed in the jail that Mills does not like gay people.

Other pertinent information included:

1. Employee-3 stated that when Mills first came to the County he would always talk to her. The attempted communications were "super friendly" and "odd".

2. Employee-3 stated that in the jail she heard corrections officers refer to Harris as a "woman" or a "faggot." Employee-3 also stated that, after Brack was terminated, many corrections officers said they were glad that the "fag is gone."

3. Employee-3 stated that there was an issue with male inmates receiving bras and panties. Floor supervisors did not want to provide the underclothes and therefore required a medical prescription before providing the underclothes to inmates. The nurses would tell the COs that no prescription was necessary, and the COs would still refuse to provide the requested underclothes to the inmates.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 8 of 14

### 7. Interview of Employee-4 – September 27, 2018

At the time of the interview, Employee-4 had been a senior leader of the Cuyahoga County Sheriff's Department for three (3) years. Employee-4 reports directly to Sheriff Pinkney. Employee-4's direct reports include an employee from both the law enforcement and administrative divisions of the Sheriff's department, the Director of Regional Corrections, and the Medical Director from MetroHealth.  As of November 19, 2018, Employee-4 is now the interim Director of Regional Corrections.

During the interview, AIG staff asked Employee-4 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-4 gave the following examples:

1. Someone (he does not remember who) told Employee-4 that Mills made a comment about Brack and Harris dating.

2. Someone (he does not remember who) told Employee-4 that there are female employees and female Judges who did not like to interact with Mills.

3. Someone (he does not remember who) commented to Employee-4 that Mills made an anti-Semitic comment about Executive Budish - something to the effect that Executive Budish is a Jew and does not want to give money to Mills' budget.

Employee-4 noted that Mills and Employee-1 did not get along well together.

### 8. Interview of Employee-5– October 1, 2018

Employee-5 ("Employee-5") is a senior leader in the County Sheriff's Department. Employee-5 started in this role in September 2018. Employee-5 reports to Warden Eric Ivey ("Ivey"), who reports to Director of Regional Corrections Ken Mills ("Mills"), who reports to Chief George Taylor who reports to Sheriff Clifford Pinkney ("Sheriff Pinkney"). Within his chain of command, Employee-5 supervises a total of sixty (60) COs, a corporal, and a sergeant—who reports directly to Employee-5. Employee-5's job duties include booking and release.

During the interview, AIG staff asked Employee-5 if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-5 gave the following example: There was a claim that Mills said one of the County employees makes too much money for a woman.

### 9. Interview of Employee-6 – October 3, 2018

Unlike other witnesses identified in this report, Employee-6 is an employee of MetroHealth Hospital System, not an employee of the County.  Employee-6 works in the County jail as the Ambulatory Director, and she has been in this position for 4 ½ years. Her duties include budgeting and operations within the CCC medical facility. Her direct reports are nurse

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 9 of 14

practitioners and paramedics, and she reports to Julia Brunner (Director of Ambulatory) at MetroHealth.

During the interview, AIG staff asked Employee-6 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-6 gave the following examples:

1. There was a rumor that Mills said Harris and Brack are gay and are dating; and

2. Employee-1 told Employee-6 that Mills said Employee-6 made too much money for a woman.

### 10. Interview of Employee-7 – October 4, 2018

Employee-7 has been with the county for five years. Her current position is Business Administrator in the Fiscal Department. She has been in her current position since February 2017, and was in Justice Services previously for one year. She is currently 2nd in command in the Fiscal Department, and her duties are to discover and manage grants whether they are federal grants, state grants and any other grants that may be available for the jails. She also manages revenue tracking, statistic request, manages the analysis, staffing numbers, etc., and ad hoc reports. Her direct reports are Lylia Latham, Judy Fulkerson, and there is a current vacancy. Employee-7 reports to Employee-1, Employee-1 reports to Taylor and Taylor reports to the Sheriff.

During the interview, AIG staff asked Employee-7 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-7 gave the following examples:

1. Employee-7 heard Mills made a comment about the Sheriff that made her uncomfortable enough to abruptly leave a meeting. Employee-7 believes the comment was something to the effect of the Sheriff is too tight to give up money for new cameras and could find the money if he wanted to," the miser"; and

2. There was a discussion that the former business service manager left the Public Safety and Justice Department because Mills was sexist; and

3. Employee-7 heard from Employee-1 that Mills said Harris and Brack were "fags".

### 11. Interview of Dr. Thomas Tallman – October 12, 2018

Dr. Thomas Tallman ("Tallman") is employed by MetroHealth Hospital, and he currently holds the position as the Medical Director of the jails. Dr. Tallman has held this position for 4 ½ years and was previously employed as an emergency room physician for the Cleveland Clinic . His duties as Medical Director are to oversee the correctional health program, including its scheduled sick call process; oversee the 24/7 intake process; respond to medical emergencies or acute medical issues as they come up, and handle the overall health of inmates. Dr. Tallman reports to Dr. Julia Brunner at MetroHealth Hospital. Dr. Julia Brunner is the Director of Ambulatory Services and Outpatient Services. She also has frequent meetings with Jane

Platten at MetroHealth Hospital. Tallman's direct reports are nurses, the director of nursing, nursing supervisor, pharmacist, x-ray tech, dental, and all healthcare workers assigned to CCC. All nurses report to Tallman even if they are county employees.

During the interview, AIG staff asked Dr. Tallman if he knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Dr. Tallman gave the following examples:

1. Employee-1 told Dr. Tallman that Mills made comments about two nurses being gay lovers; and

2. Employee-1 told Dr. Tallman that Mills said, "we're never going to get more CO's because the Jew won't spend money." (referring to Executive Budish)

### 12. Interview of Employee-8 – December 4, 2018

Employee-8 is the Charge Nurse for Mental Health and Intake at the County jail. Her responsibilities include supervising Licensed Practical Nurses and Medical Techs. Employee-8 has been a County employee for 13 years. She reports to Nursing Director Aisha Parnell who reports to Dr. Tallman and/ Employee-6.

During the interview, AIG staff asked Employee-8 if she knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. Employee-8 gave the following example:

- Employee-8 stated that Mills changed the policy regarding female CO tasks. Employee-8 explained that Mills changed the policy so that female COs could watch male pods and walk male inmates around the jail. Employee-8 stated, even when it was not necessary, Mills would require female COs to watch male pods saying something to the effect of "they took the job so they can do it."

### 13. Interviews of
#### Employee-9 – October 3, 2018
#### Employee-10 – October 9, 2018

When AIG staff asked the above employees if they knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The above employees stated they had heard rumors of discrimination and/or homophobic comments but had no specific information.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 11 of 14

**14. Interviews of**
**Employee-11 – September 28, 2018**
**Employee-12 – October 5, 2018**
**Employee-13 – October 1, 2018**
**Employee-14 – October 5, 2018**

When AIG staff asked the above employees if they knew of incidents of Mills making derogatory/discriminatory comments or engaging in derogatory/discriminatory behavior. The above employees stated they had no direct or indirect knowledge of such comments or behavior.

**15. Interview of Employee-15 – January 7, 2019.**

Employee-15 is a County corrections officer with more than ten years of service. Employee-15 stated that he personally heard Mills say "that faggot is trying to go after us", referring to Marcus Harris. Employee-15 recalled that this statement was made at some point in time after public complaints regarding the provision of medical services within the Jail.

# III. Analysis and Findings

## A. As a County Employee Kenneth Mills was Subject to the County Ethics Code

Section 402.01(F) of the County Code states "employee" shall mean any employee of Cuyahoga County, but not limited to, any person employed, full or part time in a temporary or permanent capacity, by the County Executive, the Prosecuting Attorney, the County Council, the Personnel Review Commission, the Board of Revision, the Inspector General, and any other county agency hereafter established by or pursuant to the charter. As Director of Regional Corrections, Mills was an employee for purposes of Chapters 402 and 403 of the County Code. Mills, therefore, are subject to the guidelines established by the County Code and prohibitions therein.

## B. Section 403.10 of the County Ethics Code Prohibits Discrimination

Pursuant to Section 403.10 of the County Ethics Code, no employee shall discriminate against anyone on the basis of race, religion, national origin, sex, gender, ethnicity, sexual orientation, gender identity and expression, disability, or genetic information.

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 12 of 14

## C. Cuyahoga County Employees are subject to the County Employee Handbook

### 1. Cuyahoga County is Committed to Diversity

Pursuant to Section 3.01 of the County Employee Handbook,

> The County is committed to fostering a diverse and inclusive workforce, which includes building an environment that respects the individual, promotes innovation and offers opportunities for all employees to develop to their full potential.

### 2. Cuyahoga County is an Equal Employment Opportunity Employer

Pursuant to Section 3.02 of the County Employee Handbook,

> The County is committed to providing equal employment opportunities for all individuals regardless of race, color, ancestry, national origin, language, religion, citizenship status, sex, age, marital status, sexual preference or orientation, gender identity/expression, military/veteran status, disability, genetic information, membership in a collective bargaining unit, status with regard to public assistance, or political affiliation.

### 3. Cuyahoga County Must Investigate Reports of Discrimination

Pursuant to Section 3.05 of the County Employee Handbook, once potential discrimination is reported,

> The County will investigate all reported concerns. An investigation may include conducting interviews, obtaining written statements, and reviewing records. The County will complete investigations in a prompt manner. The length of the investigation will vary based on the circumstances involved. After obtaining and reviewing all available information, the County will determine if any employee violated any County policy. The employee who made the report and the accused employee(s) will be notified in writing of this determination.

> If the County finds that an employee has violated any County policy then Human Resources, in consultation with the employee's department director or designee, will determine the appropriate action, which may include corrective action, disciplinary action, mediation, training, or transfer.

In the instant matter, the Department of Human Resources requested that the AIG conduct the investigation to avoid any appearance of bias or impropriety.

Electronically Filed 05/21/2019 16:43 / / CV 19 915039 / Confirmation Nbr. 1723525 / BATCH

Cuyahoga County Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

### D. There is sufficient evidence to indicate that Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation

Employee-1 stated that during a discussion with Mills about Harris' mileage reimbursement request, Mills said to her "You do know they're lovers? They are faggots."  Additionally, Employee-2 stated that Mills made anti-homosexual comments in her presence, noted he thought Harris and Brack were dating, and made it clear he did not like people who are homosexual.  Employee-15 stated that personally heard Mills say "that faggot is trying to go after us", referring to Marcus Harris.  Based on these three separate statements, *the AIG is of the opinion that there is sufficient evidence to indicate Mills likely made discriminatory comments about Harris and Brack's perceived sexual orientation*.  It is unclear, however, whether he took any action based on this discriminatory attitude.

### E. There is sufficient evidence to indicate that Mills was not sufficiently supportive of Cuyahoga County's Continuing Commitment to Diversity

Employee-1 stated that in 2017 during a discussion with Mills about requesting more money for cameras in the jail, Mills told her "You know the Executive is not going to give you any more money, he's a Jew".  Employee-1 further stated that in 2017 Mills told her that a sergeant in the Sheriff's department was a terrible employee and insinuated that she only got her job because she is African American. Employee-1 also stated that Mills told her Sheriff Pinkney thought he was untouchable because he is the first African American Sheriff. Likewise, Employee-2 stated that Mills told her Sheriff Pinkney was only appointed because he is African American.

Sheriff Pinkney received separate telephone calls from two female Common Pleas Judges stating they believed that Mills dislikes women.  Allegedly, one of the Judges stated she did not want to work with Mills because he was "condescending and a chauvinist".  Moreover, indicating a failure to promote a culture of respect, there was substantial belief among County employees that Mills had made inappropriate comments.

Based on the above statements and information *the AIG is of the opinion that there is sufficient evidence to indicate Mills was not compliant with the County's commitment to diversity*.  Specifically, Mills did not appear to be "fostering a diverse and inclusive workforce", or "building an environment that respects the individual".  Rather he was inappropriately concerned with the gender, race, and religion of County employees and elected officials.

## IV. Conclusion and Recommendations

The AIG's investigation found an abundance of reports regarding Mills' comments and behavior. However, there were incidents that were relayed to AIG staff by individuals who had first-hand knowledge of Mills' alleged discriminatory comments.  Specifically, three County employees separately heard Mills make different discriminatory comments regarding the perceived sexual

Mills, Kenneth
Report of Investigation
18-0050-I
January 8, 2019
Page 14 of 14

orientation of a subordinate employee and a contractor. Furthermore, Mills failed to fully comply with the County's commitment to diversity or to promote a culture of respect within the jail. Finally, the reports from the witnesses indicate a need to redouble the County's continuing efforts to support a culture of respect and to allay fears of retaliation for reporting inappropriate conduct.

Effective November 15, 2018, Mills resigned from County employment. As such, the AIG cannot recommend corrective action as to Mills. The AIG, however, recommends that the County expand its educational efforts to support a culture of respect and protection of whistleblowers.

Valissa Turner Howard
First Assistant Deputy Inspector General

1.8.19
Date

Approval as to conclusions and recommendations:

Mark D. Griffin
Inspector General

1-8-19
Date

Electronically Filed 05/21/2019 15:07 / / CV 19 915757 / Confirmation Nbr. 1713633 / BATCH

Cuyahoga County Agency of Inspector General
2079 East Ninth Street – 6th Floor • Cleveland, Ohio 44115 • (216) 698-2101
www.inspectorgeneral.cuyahogacounty.us

| From: | Akram Boutros |
|---|---|
| To: | Armond Budish |
| Cc: | cpinkney@cuyahogacounty.us; eleiken@cuyahogacounty.us; Jane Platten |
| Subject: | Jail Medical Services |
| Date: | Friday, May 25, 2018 9:06:08 AM |

Executive Budish,

Thank you for meeting with us this past Wednesday to discuss the jail medical program. As we discussed, MetroHealth is committed to our partnership with Cuyahoga County in providing the highest quality medical services at the main corrections center and it's regional facilities. We believe the relationship and delivery model we have have developed together with your staff not only provides quality, custom services but does so while demonstrating tangible cost savings for the County.

As per your request for MetroHealth to immediately remove our Nurse Supervisor employee from the jail clinic, we have made the adjustment to our staffing model and as of May 28, 2018 the employee will no longer provide services at the jail clinic. A replacement Administrator will start on site Tuesday, May 29th.

Also on Wednesday, Chief of Staff Leiken agreed to schedule a meeting with MetroHealth to further discuss the staffing model and vacancies. We appreciate the opportunity and our team is available at Chief Leiken earliest convenience for that meeting.

Thank you, Armond. Again, ware committed to our partnership and look forward to continuing to work together.

Regards,

Akram

Get Outlook for iOS

**EXHIBIT 2**

 **MetroHealth**

**Gary Brack, Supervisor, Nursing, County Correctional Healthcare (Interim Director, Ambulatory, County Correctional Healthcare)**
**Record of Discussion 6/4/18**

<u>**Description of violation**</u>: In a scenario that Mr. Brack does not generally encounter in the ordinary scope of his duties, Mr. Brack exercised poor judgment and engaged in conduct that was unprofessional and disrespectful, not in alignment with expectations of a MetroHealth leader, and against the interests of the System, its reputation, and its key relationships. His conduct was in violation of The MetroHealth System Policy II-36 Corrective Action (prohibiting grossly inappropriate behavior), MetroHealth's STAR-IQ values including Teamwork and Respect, and MetroHealth's Code of Conduct.

In a public meeting of the Cuyahoga County Council Public Safety and Justice Affairs Committee held on May 22, 2018, Mr. Brack was asked to describe the relationship between MetroHealth and Cuyahoga County regarding the clinical operations at County Corrections. Mr. Brack did provide some objective information, but he also went beyond an objective report by using highly negative and subjective terms and by lodging an unprofessional and personal attack against Mr. Kenneth Mills, Director of Regional Corrections for Cuyahoga County. In public and recorded testimony before Committee members – during which Mr. Brack repeatedly and expressly purported to speak on behalf of The MetroHealth System – Brack described the relationship between the County and MetroHealth as "very tumultuous." He called Mills "the obstructionist" in the parties' concerted efforts, stated that Mills engages in "passive-aggressive behavior" and acts with "imagined authority," and criticized Mills's nonverbal conduct and "total disrespect" in meetings, stating that "I've never in my professional career witnessed that." Without working with MetroHealth's leadership or media affairs professionals, Mr. Brack has since reinforced these sentiments to various media outlets.

Mr. Brack's conduct was in violation of specific coaching that he received prior to the meeting. Jane Platten, Chief of Staff, had specified to Mr. Brack that it was Ms. Platten's role to speak on behalf of MetroHealth at the meeting, and Mr. Brack's role was to help with technical operational questions. Ms. Platten had directed Mr. Brack that if he did speak at the meeting, he needed to do so diplomatically. He failed to do.

Mr. Brack's unprofessional and personally offensive conduct caused immediate damage to MetroHealth's relationship with Cuyahoga County and to MetroHealth's public reputation, requiring immediate attention and renewed commitments from members of MetroHealth's executive leadership. Indeed, as a client of MetroHealth's services, the County immediately requested that Mr. Brack be removed from his role at County Corrections, citing a lack of a trusting and strong working relationship. Being a contracted service provider to the County, which controls County Corrections property and operations, MetroHealth was required to comply with the County's demand.

The MetroHealth System · 2500 MetroHealth Drive · Cleveland, Ohio 44109-1998 · www.metrohealth.org

**EXHIBIT**
**3**

 **MetroHealth**

As a County hospital, MetroHealth values its partnership with Cuyahoga County, and the parties are actively collaborating on a number of highly visible, key public health endeavors, such as MetroHealth's campus transformation, improvement of the West 25th Street corridor, and the opioid crisis in the County. The parties' contractual agreement regarding provision of medical services at County Corrections has been a flagship arrangement for both parties, enabling MetroHealth to reach patients in a unique care environment while enabling the County to realize cost savings. MetroHealth does not take issue with the fact that Mr. Brack has identified and raised concerns regarding County-MetroHealth interactions or with ongoing staffing concerns; indeed, these are issues that MetroHealth leadership has worked to address and will continue to address going forward.

Rather, MetroHealth takes issue with the highly personal and unprofessional manner in which Mr. Brack raised these concerns. Mr. Brack's very negative comments about MetroHealth's relationship with the County were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations. His very personal comments about Mr. Mills constituted a gross violation of MetroHealth's policies and STAR IQ values, including Teamwork and Respect, and its Code of Conduct. Mr. Brack's public conduct brought into question his ability – and MetroHealth's ability – to continue to foster our critical relationship with the County, putting MetroHealth's interests in jeopardy.

<u>Expectations</u>: This type of inappropriate and unprofessional conduct must not occur again, and Mr. Brack is required to conduct himself in accordance with MetroHealth's STAR-IQ values, Code of Conduct, and applicable policies, especially where he purports to speak on behalf of The MetroHealth System regarding its business relationships. As a member of management, he is expected to be mindful of and act in a manner to foster MetroHealth's relationships and reputation. While he is certainly welcome to and is encouraged to raise concerns that he has, he must do so respectfully and in accordance with MetroHealth's values. For sensitive communications, he should consult MetroHealth leadership and media relations.

Though this will be considered documentation of non-disciplinary counseling, further incidents of unprofessional and inappropriate behavior will result in formal discipline, up to and including termination of employment.

| | |
|---|---|
| _(signature)_ | Date: 6-4-18 |
| Gary Brack, Supervisor, Nursing (Interim Director, Ambulatory) | |
| _(signature)_ | Date: 6/4/18 |
| Julia Bruner, MD, MS, Physician Executive, Ambulatory Operations | |
| _(signature)_ | Date: 6/4/18 |
| Emily Fiftal, Director - Employee/Labor Relations, Employment Counsel | |