## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| GARY BRACK, | ) | Case No. 1:19-CV-01436 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | William H. Baughman, Jr. |
| ARMOND BUDISH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **OPINION AND ORDER**

Since 2018, more than twelve detainees have died at the Cuyahoga County jail, numerous others have suffered serious injury, conditions remain deplorable, and significant litigation continues in State and federal court to determine the legal consequences and responsibility, if any, relating to maladministration at the jail. Public discourse places the moral and political blame for this situation at the feet of Cuyahoga County Executive Armond Budish and his administration. But there is plenty of blame to go around.

For example, before its more recent efforts to improve healthcare at the jail, MetroHealth and its leadership team headed by chief executive officer Dr. Akram Boutros took actions at the behest of Budish and his administration that allowed the regionalization efforts at the heart of the jail's troubles to proceed. When Gary Brack, a nurse who worked at the jail for MetroHealth, warned the Public Safety Committee of the Cuyahoga County Council at a public hearing on May 22, 2018 of the Budish administration's actions that jeopardized detainees at the jail, Budish personally

requested that Dr. Boutros remove Mr. Brack from his work at the jail.  Although he knew better, Dr. Boutros complied.  This failure of leadership contributed to the controversy that continues to surround the jail and deserves condemnation.

In this case, Plaintiff Gary Brack filed suit against Akram Boutros, MD, Jane Platten, and The MetroHealth System, among others, seeking damages for his removal from the jail.  Eventually, Plaintiff settled his claims for a payment from the County and dismissed his claims against the remaining Defendants.  That outcome resulted in a situation where no party to this case received a determination about the legal consequences, if any, for Mr. Brack's removal.

Given that disposition, Akram Boutros, MD, Jane Platten, and The MetroHealth System seek the vindication they did not receive in the underlying litigation by moving for sanctions pursuant to the Court's inherent authority and 28 U.S.C. § 1927 against Subodh Chandra and his law firm, who represented Mr. Brack.  (ECF No. 78.)  Initially, Movants sought sanctions against Mr. Chandra's former law partner, Ashlie Case Sletvold, as well, but they later withdrew the motion as to her.  (ECF No. 86.)  For the reasons that follow, the Court **DENIES** the motion.

## FACTUAL AND PROCEDURAL BACKGROUND

In their motion, Movants focus in particular on two allegations Mr. Chandra advanced in the underlying litigation against them, each of which they contend is false.  First, Movants argue that Mr. Chandra pursued claims on the theory that Mr. Brack spoke as a private citizen to a committee of the County Council on May 22, 2018.  (ECF No. 78, PageID #844; *id.*, PageID #849.)  Second, he also claimed that

Ms. Platten prohibited Mr. Brack from speaking or criticizing the County at that meeting.  (*Id.*)  Understanding these central claims in support of the motion requires some broader background and context, beginning with Plaintiff's allegations in the underlying case.

By way of background, and to oversimplify somewhat, at the relevant times relating to the facts at issue in the lawsuit, Cuyahoga County had a contract with MetroHealth to provide medical care and services at its jail and pretrial-detention facilities.  (*See generally* ECF No. 78-8.)

### A.    The First Amended Complaint

On May 21, 2019, Plaintiff filed suit in State court.  (ECF No. 1-1, PageID #6.)  Ms. Sletvold signed and filed the complaint.  (*Id.*; *see also id.*, PageID #36.)  The complaint asserted claims against Armond Budish, the County Executive; Ken Mills, formerly the director of the Cuyahoga County jail; MetroHealth; Dr. Boutros; and Ms. Platten.  (ECF No. 1-1, PageID #7.)  Defendants removed the case to federal court.  (ECF No. 1.)  Specifically, counsel for Movants from the law firm of Zashin & Rich effected the removal.  (*Id.*, PageID #3.)  Plaintiff filed an amended complaint on February 26, 2020.  (ECF No. 30.)  Again, Ms. Sletvold signed and filed the amended complaint.  (*Id.*, PageID #215.)  In the amended complaint, Plaintiff added Earl Leiken, Budish's chief of staff, as a Defendant and named Dr. Boutros and Ms. Platten as Defendants in their official and personal capacities.  (ECF No. 30, ¶¶ 27 & 28, PageID #186.)

The amended complaint makes the following allegations.

### A.1.    Run-Up to May 22, 2018

In 2015, MetroHealth hired Plaintiff Gary Brack, a registered nurse and medical-services administrator with 20 years' experience, to manage its nursing operations for Cuyahoga County.  (*Id.*, ¶¶ 34, 35, PageID #187.)  In 2017, MetroHealth promoted Mr. Brack to interim director of ambulatory care for the Cuyahoga County jail.  (*Id.*, ¶ 35.)  In this capacity, Mr. Brack had responsibility for managing nursing services at the jail and all that entailed.  (*Id.*, ¶ 36.)

Cuyahoga County Executive Armond Budish and his administration developed a regionalization plan for Cuyahoga County's jails to increase revenue for the County by charging local governments to house their detainees and prisoners.  *See Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 656 (6th Cir. 2021).  In March 2018, the Budish administration executed the regionalization plan, which aggravated severe overcrowding and understaffing.  *Id.* at 656–57.

On April 18, 2018, the amended complaint alleges that the County's budget director warned Budish; his chief of staff, Earl Leiken; and the County's fiscal director by email of "a critical situation in the County Jail regarding nurses."  (ECF No. 30, ¶ 5, PageID #182.)  Specifically, she alerted them that "[t]he jail is rated for approximately 1,700—it is overcrowded, prisoners are sleeping on mats on the floor, and our population is disproportionately unhealthy.  A shortage of nurses creates risk."  (*Id.*)  Leiken responded to the email by thanking the budget director for the "heads up."  (*Id.*)

According to the amended complaint, by May 2018 "healthcare at the County jail was in a state of crisis."  (*Id.*, ¶ 57, PageID #192.)  Allegedly, Ken Mills, the

4

County's Director of Corrections, blocked the hiring of nurses until the staffing situation reached a critical point.  (*Id.*)  Mills made a "mission-critical request" of County Council for additional nurse staffing.  (*Id.*)  This request prompted the Council's Public Safety Committee to hold a hearing to inquire of Mills and MetroHealth how matters had reached this point.  (*Id.*)

MetroHealth designated its medical director, Dr. Thomas Tallman, to speak for the hospital.  (*Id.*, ¶ 58.)  Because he could not attend due to a conflict, Dr. Tallman worked with Mr. Brack to prepare testimony for the Council's Public Safety Committee.  (*Id.*)  The night before the hearing, the two men sent an outline of planned remarks to Jane Platten, MetroHealth's chief of staff.  (*Id.*)  According to the amended complaint, Ms. Platten instructed Mr. Brack not to criticize the County in his remarks and not to speak without her advance permission.  (*Id.*, ¶ 59.)

### A.2.  The Hearing on May 22, 2018

On May 22, 2018, the Public Safety Committee held a public hearing, which the amended complaint describes as follows.  (*See generally id.*, ¶¶ 63–71, PageID #192–94.)  Mills allegedly denied involvement in issues relating to the hiring of nurses and blamed staffing shortages on fiscal problems.  (*Id.*, ¶ 63, PageID #192–93.)  When the Chair of the Committee asked why the staffing issues at the jail had arisen, Mills allegedly demurred.  (*Id.*, ¶ 65, PageID #193.)  Not accepting this response, the Chair pressed the point and said, "If you're not willing to answer that's fine because I'll find out."  (*Id.*, ¶ 66.)  Noting Dr. Tallman's absence, the Chair wanted to hear from someone with direct knowledge.  (*Id.*)

5

According to the amended complaint, the Chair then directly asked Mr. Brack about staffing issues.  (*Id.*, ¶ 67, PageID #194.)  Mr. Brack responded that Mills had obstructed hiring and that working relationships were not good.  (*Id.*)  In response to follow-up questions from the Chair, Mr. Brack acknowledged that financial issues were important, but not the entirety of the problem.  (*Id.*)  Another member of County Council asked Mr. Brack to address relations with Mills on operations and security.  (*Id.*, ¶ 70.)  In response, Mr. Brack characterized Mills' role as "problematic" and explained that Mills "exercised improper authority over medical services that compromised health and safety at the jail."  (*Id.*, ¶ 71.)  In doing so, Mr. Brack provided his "personal opinion" about Mr. Mills' "level of disrespect" for the sheriff, who had contractual responsibility for MetroHealth's provision of medical services at the jail.  (*Id.*; *see also id.*, ¶¶ 13 & 67.)

Allegedly, Ms. Platten repeatedly interjected in these proceedings to minimize the role of Mr. Mills.  (*Id.*, ¶ 69.)  Further, the amended complaint alleges that the chief of staff took on the role of speaking for MetroHealth at the hearing and that she had assigned Mr. Brack a secondary role to help with questions relating to issues touching on technical operations at the jail.  (*Id.*, ¶¶ 59 & 60.)

### A.3.   Events Following the Hearing on May 22, 2018

On the day after the hearing, County Executive Budish and his chief of staff drove to MetroHealth for an in-person meeting about Mr. Brack, according to the amended complaint.  (*Id.*, ¶ 72, PageID #195.)  There, they met with Dr. Boutros and Ms. Platten and demanded Mr. Brack's termination.  (*Id.*)  In an email on May 25, 2018 to Budish, copying Leiken and others, the amended complaint avers that

6

Dr. Boutros wrote:  "As per your request for MetroHealth to immediately remove our Nurse Supervisor employee from the jail clinic, we have made the adjustment to our staffing model and as of May 28, 2018 the employee will no longer provide services at the jail clinic."  (*Id.*, ¶ 73; ECF No. 30-2, PageID #230.)  That same day, the amended complaint alleges that Mr. Brack was placed on administrative leave.  (ECF No. 30, ¶ 74, PageID #175.)

On June 4, 2018, MetroHealth documented a conversation between Mr. Brack, the hospital's director of employee and labor relations, and the senior administrator to whom Dr. Tallman reported.  (ECF No. 30-3.)  That memorandum, signed by each of these three individuals, states that Mr. Brack's public comments at the hearing warranted discipline:

> In a scenario that Mr. Brack does not generally encounter in the ordinary scope of his duties, Mr. Brack exercised poor judgment and engaged in conduct that was unprofessional and disrespectful, not in alignment with expectations of a MetroHealth leader, and against the interests of the System, its reputation, and its key relationships.

(*Id.*, PageID #231.)  That memorandum called into question whether Mr. Brack spoke on behalf of MetroHealth, noting that in his comments to the committee "Mr. Brack repeatedly and expressly *purported* to speak on behalf of The MetroHealth System." (*Id.* (emphasis added).)  It further distanced the hospital from Mr. Brack's public comments:  "Without working with MetroHealth's leadership or media affairs professionals, Mr. Brack has since reinforced these sentiments to various media outlets."  (*Id.*)

With respect to his role at the meeting itself, the memorandum recites that Mr. Brack went beyond his responsibilities:  "Mr. Brack's conduct was in violation of

specific coaching that he received prior to the meeting. . . . Ms. Platten's role [was] to speak on behalf of MetroHealth at the meeting." (*Id.*) In contrast, Mr. Brack had a more limited role "to help with technical operational questions." (*Id.*) "Ms. Platten had directed Mr. Brack that if he did speak at the meeting, he needed to do so diplomatically. He failed to do [so]." (*Id.*) The memorandum makes clear that "Mr. Brack's very negative comments about MetroHealth's relationship with the County were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations." (*Id.*, PageID #232.)

MetroHealth formally terminated Mr. Brack by letter dated August 29, 2018. (ECF No. 30, ¶ 92, PageID #201.)

By November 1, 2018, the United States Marshal Service prepared a report regarding conditions at the Cuyahoga County jail. The first amended complaint references that report (*see id.*, ¶ 25, PageID #186), which is publicly available. According the U.S. Marshal Service report, six detainees had recently died, and in the previous year 55 attempted suicide. U.S. Marshal Service, Cuyahoga County Correctional Center Facility Review Report at 3, 25 (Oct. 30–Nov. 1, 2018). In the months after the report, at least six additional deaths occurred at the jail. *Moderwell*, 997 F.3d at 658.

### A.4.   Plaintiff's Causes of Action

Based on these alleged facts, Plaintiff asserted twelve claims altogether. Against all Defendants, Plaintiff alleged a conspiracy to violate his civil rights under 42 U.S.C. § 1983 in Claim 1. (*Id.*, ¶¶ 100–05, PageID #202–03.) In Claim 2, Plaintiff asserted a claim for retaliation in violation of the First Amendment, also under

42 U.S.C. § 1983, against all Defendants.  (*Id.*, ¶¶ 106–26, PageID #203–05.)  Claim 3 asserts a claim for First Amendment retaliation under Section 1983 against the County and MetroHealth.  (*Id.*, ¶¶ 127–29, PageID #206.)  Against Movants, Plaintiff alleged unlawful First Amendment prior restraint under Section 1983 in Claim 4.  (*Id.*, ¶¶ 130–33; PageID #206–07.)  Claim 5 alleges the same claim against MetroHealth.  (*Id.*, ¶¶ 134–37, PageID #207.)  Against all individual Defendants, Claims 6, 7, and 9 through 11 bring claims for civil liability for various criminal acts— interfering with civil rights, complicity, retaliation for performance of public duties, and obstructing official business—under Ohio law, some in the alternative.  (*Id.*, ¶¶ 138–50 & 157–78, PageID #207–09 & #210–13.)  Claims 8 and 12 do not directly implicate any Movant.  (*Id.*, ¶¶ 151–56 & 179–83, PageID #209–10 & #213–14.)

### B.    Pretrial Proceedings and the Mills Trial

Following removal, the case proceeded through pretrial practice.  Without reviewing every development, a few matters bear on the motion for sanctions.  First, the State had indicted Mills in January 2019 (*see State v. McNeeley, et al.*, No. CR-19-636461 (Cuyahoga Cnty. Com. Pl.)), then reindicted him on October 23, 2019 (*see State v. Mills*, No. CR-19-645266 (Cuyahoga Cnty. Com. Pl.)).  These charges related, at least in part, to the same events giving rise to Plaintiff's civil lawsuit in this case.  Specifically, in Counts Two and Three, the State charged Mills with making false statements during the Public Safety Committee meeting on May 22, 2018.  (Indictment, *State v. Mills*, No. CR-19-645266, at 2.)  Also, the State charged two counts of dereliction of duty in the management of the jail.  (*Id.* at 2–3.)

9

Because of this indictment, discovery as to Mills was stayed, and that stay occasioned delays in the case more broadly. (*See* ECF No. 29; ECF No. 49.) Movants' original counsel at Zashin & Rich withdrew, and their current counsel appeared. (ECF No. 53; Order, Aug. 28, 2020.) On December 15, 2020, the case was re-assigned. (Order, Dec. 15, 2020.) Following re-assignment, the Court ordered written discovery and Rule 30(b)(6) depositions of the County and MetroHealth to proceed so as not to delay the case further. (Minute Order, Feb. 26, 2021.) Although those depositions did not proceed, the parties scheduled the deposition of Mr. Brack. (ECF No. 59, PageID #407.)

On June 29, 2021, Defendants deposed Mr. Brack. (ECF No. 78-10, PageID #995.) Just over a month later, Movants sought leave to file a motion for summary judgment. (ECF No. 66.) Attached to the motion for leave, Movants included the motion for summary judgment they intended to file. (ECF No. 66-1.) At bottom, that proposed motion sought judgment as a matter of law on the ground that Mr. Brack did not speak at the hearing of the Public Safety Committee as a private citizen. (*See, e.g.*, ECF No. 66, PageID #437.) Instead, Movants contended, based on Mr. Brack's deposition, that he spoke in his capacity as a public employee, which defeated his claims under the First Amendment as a matter of law. (*Id.*) Plaintiff sought and received several extensions of the deadline to respond to Movants' motion for leave. (Order, Aug. 20, 2021; Order, Sept. 2, 2021; Order, Sept. 9, 2021; Order, Sept. 17, 2021.)

In the meantime, the jury in State court returned a verdict in the Mills trial. On September 10, 2021, the jury acquitted Mills on the charge of tampering with records—the one felony for which he stood trial. But the jury convicted on two counts of making false statements at the May 22, 2018 meeting and two counts of dereliction of duty—all misdemeanor offenses. (Journal Entry, *State v. Mills*, No. CR-19-645266 (Sept. 13, 2021).) Mr. Brack testified at that Mills trial.

### C.    Settlement

At a status conference on September 24, 2021, Plaintiff's counsel represented that the testimony Mr. Brack gave at the Mills trial helped provide him the day in court he had been seeking and that he had reached an agreement in principle to resolve his claims against Cuyahoga County, Budish, Mills, and Leiken. Further, Plaintiff represented that he was satisfied with that resolution and would no longer pursue claims against Movants. Accordingly, Plaintiff represented that he agreed to a dismissal of Movants with prejudice. The parties requested time to finalize the settlement and secure the necessary approvals. (*See* Minutes, Sept. 24, 2021; ECF No. 93.)

Within a couple weeks, Plaintiff requested a status conference with the Court to address an issue that arose in concluding the settlement. (ECF No. 73.) In that request, Plaintiff represented that Movants would not consent to a dismissal with the standard language that each party would bear its own fees and costs. (*Id.*, PageID #574.) At the conference that followed, Movants confirmed that they would not consent to a dismissal that included a provision compromising their right to pursue a motion for sanctions, costs, and their attorneys' fees. (ECF No. 74, PageID #576.)

11

The Court made an unsuccessful effort to resolve the impasse.  (Minutes, Oct. 26, 2021.)

Following that effort, Plaintiff moved for dismissal with each party to bear its own costs.  (ECF No. 75.)  Movants opposed.  (ECF No. 76.)  They also filed their motion for sanctions (ECF No. 78.)  After a status conference held on the record (Minutes, Nov. 3, 2021), the Court dismissed the action against all Defendants with prejudice subject to potential sanctions or other relief in Movants' application for sanctions (ECF No. 80, PageID #1076–77.)  In the end, Mr. Brack settled his claims against all Defendants in the underlying litigation for $99,000.  (ECF No. 76-2, ¶ 1, PageID #595.)  At no point in time did MetroHealth, Dr. Boutros, and Ms. Platten send a Rule 11 letter to Plaintiff.  On March 22, 2022, the Court held oral argument on the motion for sanctions.

## GOVERNING LEGAL STANDARDS

A federal district court has inherent authority to sanction bad-faith conduct. *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002) (quoting *Runfola & Assocs. v. Spectrum Reporting II*, 88 F.3d 368, 375 (6th Cir. 1996)).  "[F]ederal courts have the inherent power to impose sanctions to prevent the abuse of the judicial process." *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 502 (N.D. Ohio 2013).  Where a party litigates in bad faith or for oppressive reasons, a court may invoke its inherent authority to impose sanctions. *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)).  Such sanctions require finding

12

that "the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment." *Id.* (quoting *Smith v. Detroit Fed'n of Tchrs., Loc. 231*, 829 F.2d 1370, 1375 (6th Cir. 1987)). Although this standard overlaps to some degree with Rule 11, under which Movants did not move, overall it imposes a higher showing for the imposition of sanctions. *See, e.g.*, *BDT Prods. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 752 (6th Cir. 2010).

By statute, a court may require an attorney who unreasonably and vexatiously multiplies the proceedings personally to satisfy the costs, including attorneys' fees, that result from such conduct. That statute provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Under this statute, a court may impose sanctions "despite the absence of any conscious impropriety." *Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 396 (6th Cir. 2009) (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986)). Accordingly, an attorney is subject to sanctions, without a finding of bad faith, "at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997) (quoting *Jones*, 789 F.2d at 1230). However, more than negligence or incompetence is required. *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006). Section 1927 imposes an objective standard, under

13

which "some conduct on the part of the subject attorney that trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court." *Id.* (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)).

## ADDITIONAL LEGAL BACKGROUND

Movants' application for sanctions also takes place against the backdrop of certain legal principles that apply to claims of the sort Plaintiff asserted against Movants in the underlying lawsuit.  Because of the dismissal of Plaintiff's claims against Movants, the parties will not receive an adjudication of the merit or lack of merit of those claims, and the Court expresses no opinion on their merits.  For this reason, it is also not necessary to probe in depth the jurisprudence that would affect a ruling on those substantive claims.  But those general legal principles provide context for the facts and the parties' respective arguments on the collateral issues now before the Court.

### First Amendment

In certain circumstances, the First Amendment protects the right of a public employee to speak as a citizen on matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  Because government employees often have the best position to know "what ails the agencies for which they work," there is "considerable value" in protecting the speech of public employees. *Lane v. Franks*, 573 U.S. 228, 236 (2014) (quoting *Waters v. Churchill*, 511 U.S. 661, 674) (plurality opinion)).  Obviously, the employer has a countervailing interest in the operation of its workplace. *Id.*

14

In *Connick v. Myers*, 461 U.S. 138, 144–54 (1983), the Supreme Court established a two-part inquiry for determining when an adverse employment action taken against a public employee violates the First Amendment.  As a threshold matter, a court examines whether the employee's "speech may be fairly characterized as constituting speech on a matter of public concern." *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1186 (6th Cir. 1995) (internal citations and quotations omitted).  If so, the court employs the balancing outlined in *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), to determine if the employee's speech interests outweigh the interests of the government as an employer.  *Dambrot*, 55 F.3d at 1186.

Second, where an employee speaks pursuant to his official duties, he does not do so as a private citizen. *Haddad v. Gregg*, 910 F.3d 238, 244 (6th Cir. 2018) (quoting *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017)).  Even *ad hoc* duties can fall within an employee's responsibilities for purposes of determining whether the First Amendment protects his speech. *Davidson v. Arlington Cmty. Sch. Bd. of Educ.*, 847 F. App'x 304, 309 (6th Cir. 2021) (citations omitted).  But knowledge acquired through public employment does not automatically remove speech from the protections of the First Amendment. *Lane*, 573 U.S. at 240.

In such circumstances, the relevant question becomes whether the communication is made pursuant to one's job duties or "merely relay[s] information he learned while on the job in a way that did not affect his duties." *Dewyse v. Federspiel*, 831 F. App'x 759, 762 (6th Cir. 2020) (quoting *Fledderjohann v. Celina City Sch. Bd. of Educ.*, 825 F. App'x 289, 294 (6th Cir. 2020)).  Under the law of this

Circuit, to oversimplify somewhat, an employee's speech that does not enjoy First Amendment protection receives a narrow construction and is limited to "speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015).  Making that determination requires consideration of several factors from a non-exhaustive list, including the goals the speaker sought to advance, whether the speech occurred on the clock or in the workplace, the audience, and its general subject matter.  *See, e.g., DeCrane v. Eckart*, 12 F.4th 586, 596 (6th Cir. 2021).

*      *      *

In a separate though related line of cases, the Supreme Court has recognized that the government has an interest in securing employees who will implement official policies.  *Elrod v. Burns*, 427 U.S. 347, 367 (1976).  Under this line of authority, termination of public employees in policymaking positions based on solely on their political affiliation does not violate the First Amendment.  *Branti v. Finkel*, 445 U.S. 507, 517 (1980).  Whether a position involves policymaking presents a question of fact, and "[n]o clear line can be drawn between policymaking and non-policymaking positions."  *Elrod*, 427 U.S. at 367.  Although the Supreme Court has not addressed whether the *Elrod/Branti* exception applies to speech, not just political affiliation, it has implied that *Pickering* balancing applies to such cases.  *O'Hare Truck Serv., Inc. v. City of Northlake, Ill.*, 518 U.S. 712, 719 (1996).  Under the law of this Circuit, "where a . . . policymaking public employee is discharged on the basis of

16

speech related to his . . . policy views, the *Pickering* balance favors the government as a matter of law." *Rose v. Stephens*, 291 F.3d 917, 921 (6th Cir. 2002).

### Qualified Immunity

Because Plaintiff named Dr. Boutros and Ms. Platten as Defendants in their individual capacities, in addition to MetroHealth, they enjoy qualified immunity against suit for civil damages unless their conduct violated Mr. Brack's clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Barnes v. Wright*, 449 F.3d 709, 715 (6th Cir. 2006). "A right is 'clearly established' when its 'contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Guertin v. Michigan*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Moreover, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Rather than defining a clearly established right at a high level of generality, clearly established law must be particularized to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### ANALYSIS

Under these standards, and based on the Court's familiarity with the proceedings and record, Movants' application raises the question whether sanctions are appropriate at any of three different stages of the proceedings: (1) when Plaintiff filed suit against Movants; (2) after Movants produced various documents in discovery; and (3) after the deposition of Mr. Brack. The Court analyzes each in turn.

## I.    Filing of the Lawsuit Against Movants

Movants maintain that Mr. Chandra purposefully pursued frivolous claims against them for two years.  This argument rests on a detailed factual record that goes beyond the pleadings and requires further explication.

### I.A.    Facts Relating to Plaintiff's Claims Against Movants

Shortly after the May 22, 2018 meeting of the County Council's Public Safety Committee, Mr. Brack retained Mr. Chandra.  (ECF No. 78-6.)  By the end of June 2018, Mr. Chandra provided notice to MetroHealth that his firm represented Mr. Brack.  (*Id.*, PageID #938.)  This letter confirmed that counsel had conducted an investigation and that Mr. Brack was cooperating with an ongoing investigation by the Federal Bureau of Investigation.  (*Id.*)  From this background, Movants contend that Mr. Chandra knew or should have known that two of his central allegations against them were false, that:  (1) Mr. Brack spoke at the hearing as a representative of MetroHealth, not as a private citizen; and (2) Ms. Platten did not instruct Mr. Brack not to criticize the County or speak without her permission.  (ECF No. 78, PageID #855.)

### I.A.1. Mr. Brack's Interview with the FBI

As key evidence to support their claim that the central allegations against them were knowingly false, Movants point to a transcript of an FBI interview of Mr. Brack on June 13, 2018.  (ECF No. 78-3, PageID #895–917.)  A lawyer from Mr. Chandra's firm attended that interview.  (*Id.*, PageID #895.)  Although the interview followed the filing of the complaint, Movants reasonably assume that

Mr. Brack previously provided the same or substantially similar information to his counsel.

Movants rely on two statements in particular in support of their application for sanctions.  First, in response to a special agent's question about the background of the meeting on May 22, 2018, Mr. Brack said that he attended the meeting to "represent MetroHealth" because Dr. Tallman, the medical director, was not available.  (ECF No. 78, PageID #856; ECF No. 78-3, PageID #910.)  Based on this statement, Movants contend Mr. Chandra had no good-faith basis for a First Amendment claim.  Second, Movants point to Ms. Platten's statement to Mr. Brack at the committee hearing that "if council calls you up or needs you to come up then we'll call you up" to refute the allegation that she prohibited Mr. Brack from speaking or criticizing the County.  (*Id.*)  Mr. Brack made these statements on which Movants rely against the backdrop of considerably broader information he told the FBI, which provides further context.

### I.A.1.a. Background to the May 22, 2018 Meeting

The record does not make clear whether Dr. Tallman actually had a conflict or whether Dr. Tallman thought better of attending the meeting.  Suggesting the latter might be the case, Mr. Brack provided additional background to the special agent suggesting that Dr. Tallman's communications with a member of County Council prompted the meeting of the County Council's Public Safety Committee.  (ECF No. 78-3, PageID #909–10.)  Mr. Brack informed the FBI that Dr. Tallman called the chair of the County Council's Public Safety Committee to complain that, although the County was preparing to take over a satellite jail facility in Bedford, the Budish

Administration had not begun the process of hiring nurses for that facility, necessitating an emergency funding request for MetroHealth to use a third-party staffing agency. (*Id.*, PageID #909.) Previously, County Council approved funding for the nurses and had concerns about a request for additional funding. (*Id.*) Dr. Tallman complained to the chair of the Public Safety Committee about these circumstances, which prompted the meeting on May 22, 2018. (*Id.*)

The chair wanted Dr. Tallman to speak to the committee, not Ms. Platten or another administrator from MetroHealth, to provide first-hand information about staffing conditions in the jail. (*Id.*, PageID #910.) According to Mr. Brack, Ms. Platten told Dr. Tallman that she "was very upset" he contacted the chair of the Committee and that she wished he had not done so. (*Id.*) Saying that he was "in the hotseat with" Ms. Platten, Dr. Tallman told Mr. Brack about his conversation with her, but Dr. Tallman remained focused on ensuring adequate staffing levels at the jails. (*Id.*) In those circumstances, Dr. Tallman had a conflict and did not attend the committee meeting. (*Id.*) However, he spent a substantial amount of time preparing Mr. Brack to attend in his place. (*Id.*) The two men prepared a three-page set of notes, which they sent to Ms. Platten and Dr. Tallman's immediate supervisor. (*Id.*)

### I.A.1.b. The Meeting of the Public Safety Committee

On the day of the meeting, Ms. Platten said she was "going to take the lead." (*Id.*) She told Mr. Brack that "if council calls you up or needs you to come up then we'll call you up but otherwise let me take the lead." (*Id.*) Notably, Movants omit the very next statement Mr. Brack gave to the FBI. (*See* ECF No. 78, PageID #856.) Mr. Brack said that, as he spoke to the committee, Ms. Platten interjected a lot and

20

was "writing real big for me to stop talking [be]cause she didn't want me to say things." (ECF No. 78-3, PageID #910.)  At other times, "she put her hand down on the podium to get my attention to not say anything more.  She didn't want me to keep talking[.]" (*Id.*, PageID #912.)  Further, Mr. Brack stopped talking at her direction. (*Id.*, PageID #910.)

Mr. Brack's statement goes on.  As Mills provided false information to the committee, Mr. Brack highlighted each falsehood for Ms. Platten, who did not provide that information at the hearing.  (*Id.*, PageID #911.)  Her failure to do so prompted Mr. Brack to criticize Mills in response to direct questions from the chair of the committee who wanted to hear from someone with first-hand knowledge of jail staffing issues.  (*Id.*, PageID #912.)  In doing so, Mr. Brack gave the committee his "personal opinion" about the role Mills played in the problems in the administration of the jail.  (ECF No. 30, ¶ 71, PageID 194.)

### I.A.1.c. The Immediate Aftermath

Immediately after the meeting, others in attendance advised Mr. Brack that Ms. Platten is "mad at you" and hoped that he would not "get fired over this."  (ECF No. 78-3, PageID #912.)  They recognized that there would be "a lot of political fallout."  (*Id.*)  Based on their comments, Mr. Brack shared that opinion.  (*Id.*)

Later that night, Ms. Platten called Mr. Brack.  (*Id.*)  She told Mr. Brack, "I am not upset with you[,] I just wished it would have went a little bit better."  (*Id.*) She went on to express concern that Mr. Brack's public comments "can come back to bit[e] us.  She said you just have to be very careful when you say things publicly." (*Id.*)  She provided additional assurance that she did not have an issue with

Mr. Brack.  (*Id.*)  Other than that, Mr. Brack said he had no other contact with her after the meeting.  (*Id.*, PageID #914.)

Further, according to what Mr. Brack told the FBI, when MetroHealth removed him from his position at the jail, three administrators told him a few days after the meeting that they made the decision "based on the County council meeting." (*Id.*, PageID #913.)  One of the administrators told him that "the County has recommended that you be removed, and we have to honor their request since we're a vendor."  (*Id.*)  She added that "we don't want to fire you so we're going to see if we can find you a position over at the medical center that fits your skills."  (*Id.*)  Still, they advised him that "this is very serious what you said. . . . [Y]ou attacked a public official and there could be discipline as a result of this."  (*Id.*)  Confirming this adverse employment action related to speech, they told Mr. Brack, "[t]his isn't about your work.  We know that you're a good nurse and a good leader."  (*Id.*)

### I.A.2. Mr. Chandra's Press Conference

On May 21, 2019, Plaintiff filed suit.  (ECF No. 1-1, PageID #6.)  The next day, Mr. Chandra held a press conference, to which Movants point as evidence of malice. (ECF No. 78, PageID #856–57.)  In particular, Movants cite five comments from the press conference.  First, Mr. Chandra announced that Mr. Brack was instructed not to speak at the committee hearing:

> specifically instructed . . . not to speak other than on purely technical issues, that it was not part of his job, that he was not supposed to say anything—in part, apparently, because of the feat that he would tell the truth.  So, he was specifically told that he was not to engage the Council members.

(ECF No. 78, PageID #857; ECF No. 78-3, PageID #879.) Second, Mr. Chandra said that Ms. Platten "imposed the prior restraint on behalf of MetroHealth" in violation of the First Amendment, "telling Mr. Brack that he couldn't warn the County Council in the hearing or, or anyone about what was actually going on in the jails." (*Id.*) Third, Movants complain that Mr. Chandra attacked them for having no respect for the Constitution and willfully violating the First Amendment:

> It is astonishing and breathtaking that we have public officials so high ranking in this County, both at the hospital—and MetroHealth is a public hospital—and at the County who simply displayed—in this instance—no respect for the United States Constitution and the First Amendment. None whatsoever.

(ECF No. 78-3, PageID #880.)

Fourth, Movants fault Mr. Chandra for making false statements about the contract between MetroHealth and the County to place Movants' actions with respect to Mr. Brack to create a public misimpression of the options available to them under the circumstances. At the press conference, Mr. Chandra read from the contract and told the press that the County "will have no authority to select or remove any medical unit, administrative or clinical staff, . . . and have no direction, control or direct or indirect oversight over medical unit staff." (*Id.*, PageID #881.) In fact, the contract from which Mr. Chandra read dates from March 28, 2019 (*see* ECF No. 78-9, PageID #970)—considerably after the events at the public hearing involving Mr. Brack on May 22, 2018 and the ramifications for his employment in the days and weeks that followed.

Fifth, Movants take exception to Mr. Chandra's accusation that they engaged in criminal conduct:

> They are criminal acts under the Ohio Revised Code to retaliate against a public servant in the discharge of their duties. To interfere for public servants . . . to interfere with someone's civil rights. There's constitutional rights. There's statutory rights. And that's what we see happen here.

(ECF No. 78-3, PageID #892.)

Pointing to these statements Mr. Chandra made, Movants contend that the press conference was inflammatory "out of Chandra's playbook" and evidence of malicious intent designed to sway public sympathy for purposes of coercing a settlement. (ECF No. 78, PageID #858–59.)

### I.A.3. First Amended Complaint

Movants view the first amended complaint, filed in February 2020, as deliberately including false allegations to prevent dismissal of MetroHealth, Dr. Boutros, and Ms. Platten as Defendants. (*Id.* PageID #859.) In Movants' view, "Chandra had a choice here to amend and reflect what Brack told [him], but chose not to." (*Id.*)

They rely on certain allegations as deliberately misstating facts to maintain claims against them to force them to incur fees and costs at the price of a coerced settlement. (ECF No. 78-1, PageID #868.) For example, in the first amended complaint, Plaintiff alleged that Ms. Platten "repeatedly diverted questions about Mills's role in medical-care issues," which prompted members of County Council to ask Mr. Brack "for his opinion about relations with the County, and its role in the healthcare crisis" at the jail. (ECF No. 30, ¶ 11, PageID #183; *see also* ECF No. 1-1, ¶ 10, PageID #10.) But a transcript of the Public Safety Committee Meeting reflects, after Mills finished his remarks, the following exchange:

Michael Gallagher:  Now I know Dr. [Tallman] was going to be here, he couldn't be here he's at a conference, is there anybody here that was sent [for Dr. Tallman] instead?

Jane Platten:  I.

Michael Gallagher:  No, directly from the jail?

Jane Platten:  Yes.  Actually, I [have] a supervisor . . .

Michael Gallagher:  Okay.  Who might that be?

Jane Platten:  My name is Jane Platten, and I'm the Chief of Staff at MetroHealth and Gary Brack is here.  He's our nursing supervisor.

\*        \*        \*

Michael Gallagher:  Gary Brack.  Gary, my question to you was the question to the director [Mills].  What is the relationship as far as the medical staff and the sheriff's department at Cuyahoga County?

Gary Brack:  It's very tumultuous.  The MetroHealth staff which runs medical operations for the jail, we have a great relationship with sheriff Pinckney, with the chief. Ken Mills was the obstruction of this whole process.

(ECF No. 78-1, PageID #868–69; ECF No. 78-10, PageID #1057–58.)  Then, the chair

of the committee asked Mr. Brack to explain what he meant by that statement.  (ECF

No. 78-10, PageID #1058.)

As another example, at oral argument Movants pointed to the allegations in

the amended complaint that Dr. Boutros restrained Mr. Brack from speaking at the

hearing.  Apparently, Movants take issue with the allegation that "MetroHealth,

through its sufficiently empowered policymakers, imposed and ratified orders

prohibiting Nurse Brack from responding honestly to questions from legislators if his

responses were harmful to MetroHealth's reputation or would embarrass the

County."  (ECF No. 30, ¶ 131, PageID #206.)  Plaintiff's prior restraint allegations go

on to allege that "MetroHealth, Boutros, and Platten purported to require Nurse Brack to seek permission before speaking, and forbade him from criticizing the County." (*Id.*)  Pointedly, Movants maintain that there is no evidence and no allegation that Mr. Brack so much as communicated with Dr. Boutros before the hearing, making this allegation sanctionable.  Further, these allegations in Count 4 tie back to the claim that, "[b]efore the hearing, . . . Platten instructed Nurse Brack not to criticize the County, and directed him not to speak without her advance permission."  (*Id.*, ¶ 59, PageID #192.)  Movants contend that the evidence demonstrates these allegations are false and sanctionable.

And a third example:  Movants take issue with an allegation in the first amended complaint that they advised in July 2018 that MetroHealth "would be terminating Nurse Brack's paid leave if he did not accept other non-director roles (or serve as a staff nurse) while he explored options.  None of the roles MetroHealth offered were equivalent to his previous director-level responsibilities." (ECF No. 78-1, PageID #871.)  The correspondence the general counsel of MetroHealth sent to Mr. Chandra, on which this allegation is based, confirmed that Mr. Brack is qualified for several available positions and specifically identifies one such position in which Mr. Brack expressed interest and was pursuing.  (*Id.*; ECF No. 78-7, PageID #943.) In relevant part, that letter states:

> Since day one, we have worked with Mr. Brack to find another available position at MetroHealth—and there are indeed several available positions for which Mr. Brack is qualified.  He has explored options that would not be considered a demotion, including Assistant Nurse Manager in the Emergency Department (Mr. Brack's title is that of Nursing Supervisor, though he has been serving temporarily in an Interim

26

Director role).  However, Mr. Brack withdrew himself from consideration for that ED position and declined to meet with ED leadership about it.  Mr. Brack is currently exploring the position of Manager of Patient Safety in MetroHealth's Quality department, which likewise would not be a demotion.  I understand that this is the only position in which Mr. Brack has expressed current interest and that he wishes to pursue.

(*Id.*)

## I.B.    Application of Legal Standards

Based on this record, the Court cannot say that Mr. Chandra lacked a good-faith belief for the claims asserted in the complaint or the first amended complaint against Movants.  In fact, the record demonstrates—and the Court finds—that the facts available based on Mr. Chandra's pre-suit investigation and during the pleading stage provide a good-faith basis for the claims asserted, factually and legally.  Whether they have sufficient merit to survive summary judgment or for Plaintiff to prevail at trial presents another question, one the Court need not consider.

### I.B.1. The Hearing, Its Aftermath, and the FBI Interview

As a threshold matter, although the record provides no reason to believe Mr. Chandra attended the FBI's interview of Mr. Brack, a member of his firm did (*see* ECF No. 78-3, PageID #PageID #895), and it is fair to assume he received a report—perhaps even one closely approximating the information reflected on the transcript.  In their motion, Movants cherry pick statements from Mr. Brack's interview with the FBI to try to cobble together a basis for sanctions.  With respect to the two statements in particular from the transcript of that interview on which Movants rely, the record shows that in context they do not support Movants' arguments.  In fact, their broader

context shows that Movants take these statements in isolation to try to change their meaning.

*First*, Mr. Brack told the FBI that he attended the Council meeting to "represent MetroHealth" because Dr. Tallman, the medical director, was not available.  (ECF No. 78, PageID #856; ECF No. 78-3, PageID #910.)  But attending the meeting as an employee or in one's official capacity does not necessarily, as a matter of fact or law, bring every statement made at the meeting within the scope of one's official duties.  Indeed, within days of the meeting, MetroHealth agreed with Mr. Brack in writing that he exceeded his responsibilities when he spoke at the meeting:  "Mr. Brack's conduct was in violation of specific coaching that he received prior to the meeting. . . . Ms. Platten's role [was] to speak on behalf of MetroHealth at the meeting."  (ECF No. 30-3, PageID #231.)  In contrast, Mr. Brack had a more limited role "to help with technical operational questions."  (*Id.*)  That memorandum bluntly says that the key comments Mr. Brack made to the Public Safety Committee "were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations."  (*Id.*, PageID #232.)  Further, it confirms that Mr. Brack's public statements following the meeting of the Public Safety Committee were similar and also exceeded his role as an employee because he made them "[w]ithout working with MetroHealth's leadership or media affairs professionals."  (*Id.*, PageID #231.)

*Second*, Movants point to the transcript to refute the allegation that Ms. Platten prohibited Mr. Brack from speaking or criticizing the County at the

28

meeting.  (ECF No. 78, PageID #856; ECF No. 78-3, PageID #910.)  But Movants fail to account for Mr. Brack's statements to the FBI that, as he spoke, Ms. Platten directed him to stop speaking and that he did so at her direction.  (ECF No. 78-3, PageID #910, PageID #912.)  These statements to the FBI undermine a central pillar of Movants' request for sanctions.  At least at the pleading stage in the underlying litigation, Mr. Brack's interview with the FBI supports the allegations his counsel made in the complaint and first amended complaint that Movants wanted to control the message to the committee to avoid criticism and instructed Mr. Brack not to speak.

But Mr. Brack's statement goes on.  Movants make no mention that, as Mills provided false information to the committee, Mr. Brack highlighted each falsehood for Ms. Platten, who did not provide that information at the hearing.  (*Id.*, PageID #911.)  Her failure to do so prompted Mr. Brack to criticize Mills in response to direct questions from the chair of the committee who wanted to hear from someone with first-hand knowledge of jail staffing issues.  (*Id.*, PageID #912.)  In doing so, Mr. Brack gave the committee his "personal opinion" about the role Mills played in the problems in the administration of the jail.  (ECF No. 30, ¶ 71, PageID #194.)  Whether Plaintiff would ultimately have prevailed on his First Amendment claims in the litigation remains an open question, one to which the parties will not receive an answer.  But the record provides a good-faith basis for the claims asserted.  Although Movants certainly resent the lawsuit and allegations against them, the record does not support their request for sanctions.

29

Movants object that the record of the Public Safety Committee does not reflect any version of the facts pled in either complaint.  When Ms. Platten tried to speak, the transcript shows that members of the County Council immediately turned to Mr. Brack—not Ms. Platten—suggesting that she did not instruct Mr. Brack not to speak or otherwise interfere with the exercise of his First Amendment rights, even if he spoke as a private citizen and not as part of his official responsibilities.  (ECF No. 78-1, PageID #868–69; ECF No. 78-10, PageID #1057–58.)  Again, this argument overlooks the direction Mr. Brack contends Ms. Platten gave him to stop speaking, and Mr. Brack told the FBI he did so at her request.  (ECF No. 78-3, PageID #910, PageID #912.)

Two other points from Mr. Brack's interview with the FBI interview fatally undermine Movants' request for sanctions.

### a.

Mr. Brack's description to the FBI about what happened after the meeting undermines the argument that he must have told Mr. Chandra contrary information such that the complaint was filed in bad faith.  Immediately after the meeting, others in attendance advised Mr. Brack that Ms. Platten is "mad at you" and hoped that he would not "get fired over this."  (ECF No. 78-3, PageID #912.)  They recognized that there would be "a lot of political fallout."  (*Id.*)  Based on their comments, Mr. Brack shared that opinion.  (*Id.*)  These broader reactions to the hearing lend support to Plaintiff's allegations and litigating positions.

30

Later that night, Ms. Platten called Mr. Brack.  (*Id.*)  She told Mr. Brack, "I am not upset with you[,] I just wished it would have went a little bit better."  (*Id.*)  She went on to express concern that Mr. Brack's public comments "can come back to bit[e] us.  She said you just have to be very careful when you say things publicly."  (*Id.*)  She provided additional assurance that she did not have an issue with Mr. Brack.  (*Id.*)  Other than that, Mr. Brack said he had no other involvement with her after the meeting.  (*Id.*, PageID #914.)  Of all the information in the transcript of the FBI interview, this statement provides some support for Movants' position.  However, it is one statement among many contrary ones, and at the pleading stage Mr. Brack's statements as a whole provide a good-faith basis for an objectively reasonable lawyer to make the allegations in the complaint and in the first amended complaint.

### b.

According to what Mr. Brack told the FBI, when MetroHealth removed him from his position at the jail, three administrators told him a few days after the meeting that they made the decision "based on the County council meeting."  (*Id.*, PageID #913.)  One of the administrators told him that "the County has recommended that you be removed, and we have to honor their request since we're a vendor."  (*Id.*)  She added that "we don't want to fire you so we're going to see if we can find you a position over at the medical center that fits your skills."  (*Id.*)  Still, they advised him that "this is very serious what you said. . . . [Y]ou attacked a public official and there could be discipline as a result of this."  (*Id.*)  Confirming this adverse employment

action related to speech, they told Mr. Brack, "[t]his isn't about your work.  We know that you're a good nurse." (*Id.*)

Contrary to Movants' claim, this information provides counsel with a good-faith belief that Movants sought to discipline Mr. Brack based on expressing his personal opinions about the County's administration of the jail in a public forum in response to direct questions from members of County Council.  In fact, Mr. Brack said as much to the FBI, saying that Movants removed him:  "[in] direct response to County council calling me up there.  They called me up there.  [Two Council members] asked me specific questions on what I felt was the reason that positions weren't filled.  So, in answering their question, I was truthful and honest." (*Id.*)  These subsequent actions give rise to at least an inference that Movants disavowed that Mr. Brack spoke for them at the committee hearing.  Indeed, in the June 4, 2018 memorandum MetroHealth officials signed with Mr. Brack, the hospital sought to distance itself from his public comments, going so far as to suggest that his comments at the hearing were "outside the scope of his role." (ECF No. 30-3, PageID #232.)

### I.B.2. Press Conference

Other than the fact that Movants dispute various statements Mr. Chandra made at the press conference, they fail to explain how the press conference represents a bad-faith litigation tactic or an abuse of the judicial process.  Indeed, they make no argument that it multiplied the proceedings under Section 1927, and it is difficult to see how it did so.  At most, Movants maintain that Mr. Chandra intended the press conference to force them to settle Plaintiff's claims.  But given the nature of the allegations, the parties involved, and the subsequent deaths at the jail, the press

32

would have covered the lawsuit whether Mr. Chandra called a press conference or not.  Understandably, Movants resent the public criticism Mr. Chandra directed at them—and he directed over-the-top and scathing criticism at them, going so far as to accuse them of having no respect for the Constitution.  But such criticism goes with the territory for public officials and more likely stiffened the resistance of Movants to Plaintiff's claims than brought any additional public pressure for a settlement.

In general, Movants fault Mr. Chandra for publicizing the same allegations already discussed—that Mr. Brack spoke at the hearing as a representative of MetroHealth, not as a private citizen, and Ms. Platten did not instruct Mr. Brack not to criticize the County or speak without her permission.  For the reasons stated above, these complaints do not support a request for sanctions.  Additionally, Movants rely on Mr. Brack's deposition as further support for their arguments, and the Court considers that transcript later as a separate possible ground for sanctions.

Two arguments Movants make about the press conference require a further response.  First, at first blush, Movants have a point about the factual accuracy of some of Mr. Chandra's attacks directed at them during the press conference.  For example, they charge that Mr. Chandra deliberately read from a later version of the contract between MetroHealth and the County and passed it off as the version in effect at the time of the events at issue.  (ECF No. 78, PageID #858.)  After reading from the contract, Mr. Chandra told the press that the County "will have no authority to select or remove any medical unit, administrative or clinical staff, . . . and have no direction, control or direct or indirect oversight over medical unit staff."  (ECF

No. 78-3, PageID #881.)  As with many of Movants' claims, however, this one fails to withstand scrutiny.  Contrary to what Movants say, Mr. Chandra identified the language from the 2019 contract as coming *after* the events at issue in the underlying litigation.  (ECF No. 78-3, PageID #881–82.)  Those details might well have been lost on the press, and Mr. Chandra might have hoped for or even encouraged such coverage.  But in his remarks at the press conference, Mr. Chandra plainly identified the contract language giving MetroHealth staffing control as coming from a later contract (*id.*)—directly contrary to Movants claim in their application for sanctions (ECF No. 78, PageID #858).

Second, both in their brief and at oral argument Movants appear to take issue in particular with Mr. Chandra's statements accusing them of criminal acts.  (*Id.*)  Again, one can easily understand the personal reaction of Dr. Boutros and Ms. Platten to such a charge, particularly in a high-profile and public setting.  In point of fact, however, the complaint—and the first amended complaint—alleged violations of Section 2307.60 of the Ohio Revised Code, which creates civil liability for criminal acts.  A claim under this statute does not require a criminal conviction.  *See Buddenberg v. Weisdack*, 161 Ohio St. 3d 160, 2020-Ohio-3832, 161 N.E.3d 603, ¶¶ 1–2.  And Movants did not seek dismissal of these claims.  Therefore, while one can easily understand the emotion and human reaction to Mr. Chandra's charge at the press conference, it is difficult to see a basis for sanctions there.

At bottom, Mr. Chandra did not make the specific statements about which Movants complain in a pleading or in court.  Nor do they bring claims for defamation.

In fairness, Movants use them as evidence of malice and not as separate grounds for sanctions.  Mr. Chandra's statements at the press conference, however aggressive and hyperbolic, largely track the allegations in the complaint and, later, the first amended complaint.  Again, the transcript of Mr. Brack's statement to the FBI provides sufficient bases for Mr. Chandra's statements, which fall within the bounds of a lawyer's advocacy for his client.

### 1.B.3. Amendment

Based on review of the transcript of Mr. Brack's interview with the FBI and the foregoing analysis, the argument that the amended complaint deliberately included false allegations to prevent dismissal of Movants does not withstand scrutiny.  (*See* ECF No. 78, PageID #859.)  The overwhelming majority of the operative factual allegations pled in the amendment against Movants involve contested interpretations of the facts.  Others Movants take out context or construe in a self-interested and one-sided way.  Again, one can hardly blame them for having such a view—particularly in light of the allegation in the amendment that the transcript of the public hearing appears to contradict.  Contrary to the amendment's characterization of Ms. Platten as "repeatedly divert[ing] questions about Mills's role in medical-care issues," which prompted members of County Council to ask Mr. Brack to speak (ECF No. 30, ¶ 11, PageID #183; *see also* ECF No. 1-1, ¶ 10, PageID #10), the transcript shows that the chair of the committee immediately addressed Mr. Brack after Mills spoke (ECF No. 78-1, PageID #868–69; ECF No. 78-10, PageID #1057–58).  Still, the allegation is subject to interpretation about the particular portions of the hearing to which it refers.  In any event, even assuming the worst, the

35

allegations in the amended complaint do not cross the line from advocacy to a misuse of the judicial process.

Similarly, Movants' argument that the prior-restraint allegations against Dr. Boutros in particular are false because Mr. Brack and Dr. Boutros did not speak before the hearing elevates literalism over the substance of the allegation.  Plaintiff alleged that "MetroHealth, through its sufficiently empowered policymakers, imposed and ratified orders prohibiting Nurse Brack from responding honestly to questions from legislators if his responses were harmful to MetroHealth's reputation or would embarrass the County."  (ECF No. 30, ¶ 131, PageID #206.)  And there is no dispute that Mr. Brack communicated with Ms. Platten directly before the public hearing.  In these circumstances, an allegation that Dr. Boutros might have liability (through the actions of his chief of staff) hardly presents a sanctionable abuse, whatever its ultimate merits.  Finally, the actions of MetroHealth following Mr. Brack's discipline and ultimate termination present disputes of fact over which the parties can argue in good faith.  Whether one side or the other has the better of the argument legally or factually is not the issue on this motion and not something anyone will ever know following the dismissal of Plaintiff's claims.  The Court expresses no opinion on the merits of the facts or law relating to those claims.  But that debate demonstrates that Plaintiff had a good-faith basis for the allegations.

\*     \*     \*

Based on the foregoing analysis, the Court finds that Mr. Chandra had a good-faith basis at the pleading stage for the facts alleged and claims asserted and that he did not advance claims against MetroHealth, Dr. Boutros, and Ms. Platten for an

improper purpose.  For these reasons, sanctions pursuant to the Court's inherent authority are not warranted.  *See Big Yank*, 125 F.3d at 313.  Further, finding that the allegations and claims would not violate Rule 11, Movants cannot make the higher showing , *a fortiori*, for imposition of inherent-authority sanctions.  *See BDT Prods.*, 602 F.3d at 752.  With respect to sanctions under Section 1927, applying its experience and the objective standard under the statute, the Court finds that Mr. Chandra's conduct at this stage of the proceedings does not fall short of the obligations a member of the bar owes to the Court.  *See Red Carpet Studios*, 465 F.3d at 646.

## II.    Maintaining Suit After Movants' Produced Documents

To support their motion, Movants rely on the documents they produced in discovery, contending the documents show that Plaintiff lacked a good-faith basis for pursuing and maintaining the claims against them.

### II.A.   Facts Emerging from Movants' Document Production

Movants turned documents over in two different productions.

#### II.A.1. First Document Production

On December 31, 2020, Movants produced documents relating to the run-up to the meeting of the Public Safety Committee on May 22, 2018.  Movants call out five documents in particular:

1.      An email sent on May 16, 2018 at 2:11 pm from Dr. Tallman to an employee of the County in response to the invitation for MetroHealth to speak at the Committee Hearing.  In that email, Dr. Tallman begs off due to a conflict, but states that his department "really needs to be heard" and that Mr. Brack "will represent

this department extremely well." (ECF No. 78-10, PageID #1030; *see also* ECF No. 78-4.)

2. An email sent on May 16, 2018 at 1:14 pm from Dr. Tallman to Ms. Platten, copying Mr. Brack and others, advising that the opportunity for MetroHealth to present to the Committee "is our chance to be completely transparent because Mills is so obstructive." (ECF No. 78-10, PageID #1031.) Dr. Tallman noted that the County "request[ed] my presence, as well as Gary [Brack] and Kelly [Blevins, the director of nursing]" and recommended that MetroHealth attend and that Ms. Platten do so as well. (*Id.*)

3. An email sent on May 18, 2018 at 11:59 am from Dr. Tallman to the sheriff at the time, copying Mr. Brack and others, advising that the chair of the committee requested MetroHealth and the sheriff to speak about the status of hiring nurses at the jail. Dr. Tallman tells the sheriff that Ms. Platten will attend, "which is most important," and that Mr. Brack plans to attend too. (*Id.*, PageID #1032.) Dr. Tallman describes attendance at the committee meeting as "a very significant and yet rare opportunity for us." (*Id.*) Although Dr. Tallman could not attend, "Gary [Brack] and I will prepare a 1 page of bullets and details, in anticipation of 'setting the record straight'." (*Id.*)

4. An email exchange on May 21, 2018. At 4:53 pm, Dr. Tallman emailed Ms. Platten, copying Mr. Brack and others, reminding them of the background to the Public Safety Committee meeting the next day. "Gary [Brack] and Kelly [Blevins, the director of nursing] will be there tomorrow. . . . We prepared a script / template

38

for reference and Gary will share that with you." (*Id.*, PageID #1033.)  In response at 5:00 pm, Ms. Platten says, "Please send me the script/reference sheet as soon as possible so I can review it before tomorrow.  If they ask us questions, I'll take the lead and ask Gary [Brack] to help me out when needed." (*Id.*)

5.      An email sent on May 21, 2018 at 11:25 pm from Mr. Brack to Ms. Platten.  That email forwards "some brief points" in addition to the talking points or script Dr. Tallman previously sent.  (*Id.*, PageID #1034; *see also* ECF No. 78-5, PageID #934.)  Mr. Brack advised that he "can talk about [these brief points] in depth if necessary" at the hearing.  (ECF No. 78-10, PageID #1034, ECF No. 78-5, PageID #934.)  Further, Mr. Brack said that he had "copies of emails from department heads validating our facts" and indicated that he was still gathering additional information "outlining Ken Mills behavior." (*Id.*)  Mr. Brack closes the email by telling Ms. Platten that he "will be prepared to speak tomorrow." (*Id.*)

According to Movants, each of these emails shows that Mr. Brack attended the hearing on May 22, 2018 in his capacity as a public employee and solely for the purpose of answering questions on behalf of MetroHealth, depriving Plaintiff of a basis for the claims asserted against them.

### II.A.2. Second Document Production

In this document production, Movants produced internal communications relating to Mr. Brack's termination.  They point to four documents in particular to show that they did not take any adverse employment action against Mr. Brack because of protected speech at the committee meeting:

39

1.    An email exchange on May 24, 2018.  MetroHealth's director of employee and labor relations forwards to Ms. Platten a copy of Mr. Brack's resume and confirms that Mr. Brack has a "very strong [emergency department] background" where MetroHealth has a need.  (ECF No. 78-3, PageID #918.)  The director states that "we can help facilitate slotting him into a role" and describes how the process would work: "the employee would be informed of elimination with a two-week notice.  They'd need to look at vacancies and apply/compete for them like any other internal candidate." (*Id*.)  While offering to facilitate a placement in another position, the director states: "We feel, though, that this is more akin to where an employee is promoted into nursing management and doesn't work out in that role for various reasons."  (*Id*.)

2.    In response, Ms. Platten says that her "inclination on the discussion about possible discipline is to go lightly.  I don't want him to go home and go on leave thinking he's going to get fired.  I'm not comfortable with a strong approach on that as you know."  (*Id*.)

3.    An email, also on May 24, 2018, in which the director of employee and labor relations responds to Ms. Platten.  She agrees then says, "I will tell him that the intent is not to terminate his employment.  We try to assure folks of that when we can."  (*Id.*, PageID #921.)

4.    A third email on May 24, 2018, from MetroHealth's chief nursing officer, responding to Ms. Platten's comments in the email mentioned above.  In her email, the chief nursing officer agrees with Ms. Platten and says, "We will find him something if he is interested in staying."  (*Id.*, PageID #919.)

### II.A.3. Additional Documents

To support their motion, Movants rely on two additional documents. First, in an email to Mr. Brack dated June 4, 2018, an employee in human resources advised that he would remain on paid leave while MetroHealth investigated other opportunities for him: "I talked with [MetroHealth's the director of employee and labor relations] and you would stay on paid administrative leave for the moment, while we investigate potential opportunities for you." (ECF No. 78-10, PageID #1037.)

Second, Movants point to Mr. Chandra's letter dated June 29, 2018 as a supposed contrast to their purported good-faith and to lay Mr. Brack's later employment situation at the feet of his counsel. (ECF No. 78, PageID #861.) To do so, Movants reply on Mr. Chandra's request that MetroHealth take "no further actions," including "any reassignment" of Mr. Brack to any other position. (*Id.*; ECF No. 78-6, PageID #939.)

### II.B. Application of Legal Standards

In the end, the documents on which Movants rely do nothing to undermine the factual predicate for Plaintiff's claims. Even assuming that Mr. Brack appeared at the hearing to answer questions on behalf of MetroHealth, Plaintiff alleges that the capacity in which he spoke changed during the course of the hearing—both because Ms. Platten directed him to stop speaking and because he went beyond merely answering questions to providing additional information to the committee and beyond speaking in his official position. That position might have merit. It might not. Under the First Amendment principles the Supreme Court and Sixth Circuit have handed

down, analyzing the merits involves more than mechanical application of bright-line rules.  To the contrary, the analysis involves interpretation and balancing of various factors.  *See, e.g.*, *DeCrane*, 12 F.4th at 596.  Again, the parties will not receive a ruling one way or the other on the merits of those claims, and the Court declines to offer one.

As for the documents to which Movants point for their defense that they did not take adverse employment action against Mr. Brack because of his speech, one suggests that MetroHealth's director of employee and labor relations viewed Mr. Brack as not "work[ing] out in that role for various reasons" (ECF No. 78-3, PageID #918), which a reasonable finder of fact could attribute to Mr. Brack's comments at the public hearing.  Additionally, the June 4, 2018 memorandum that MetroHealth had Mr. Brack sign attempts to put distance between the hospital and Mr. Brack's public comments at the hearing.  Counsel for the hospital drafted it and describe Mr. Brack's speech at the hearing as "repeatedly and expressly purport[ing] to speak on behalf of The MetroHealth System."  (ECF No. 30-3, PageID # 231.) Further, the memorandum recites that Mr. Brack went beyond his limited role at the hearing and disavows his comments, which "were outside the scope of his role and should have been handled through appropriate MetroHealth leadership and media relations."  (*Id.*, PageID #232.)

Whichever party ultimately has the better of the factual dispute between them, for present purposes it is enough to say that the documents Movants produced in discovery do not fundamentally change the mix of information available to

42

Mr. Chandra to show that he acted in bad faith after their production.  *See Big Yank*, 125 F.3d at 313.  Nor do they fall so far outside the bounds of the common experience of reasonable jurists and lawyers that they warrant sanctions under Section 1927. *See Red Carpet Studios*, 465 F.3d at 646.

## III.    Maintaining Suit Following Mr. Brack's Deposition

Movants base much of their request for sanctions on the deposition testimony that Mr. Brack gave on June 29, 2021.  Movants look to Mr. Brack's testimony on several key issues to support their motion for sanctions.  Moreover, they use Mr. Brack's testimony on these topics to relate back to the state of knowledge Mr. Chandra had both pre-suit and at earlier stages in the litigation.

### III.A. Mr. Brack's Deposition

Mr. Chandra and Ms. Sletvold both defended the deposition, though the transcript reflets that Mr. Chandra took the lead.  In fact, in the excerpts provided to the Court, Ms. Sletvold did not speak.  Although counsel for Movants conducted most of the questioning of Mr. Brack, counsel for other Defendants examined the witness as well, but Mr. Brack's counsel did not do any redirect or ask follow-up questions.

### III.A.1. Testimony Regarding Mr. Brack's Job Responsibilities

At his deposition, Mr. Brack testified about his responsibilities as the interim director of ambulatory care for the Cuyahoga County jail.  With Dr. Tallman, he reviewed policies, quality issues, and incident reports at the jail and worked to implement MetroHealth's standards and policies at the jail.  (ECF No. 78-10, PageID #997, #1000 & #1016.)  Mr. Brack described his role as "leading a team of nurses, providing care that focused on correctional standards and best medical practices."

43

(*Id.*, PageID #106.)  In his role, Mr. Brack had a positive impact on policies at the jail (*id.*, PageID #997–98), and Dr. Tallman gave weight to Mr. Brack's views on appropriate policies for the jail (*id.*, PageID #997)  He also had some responsibilities on employment issues and for budgeting.  (*Id.*, PageID #997 & #999–1000.)

With respect to the mission-critical issue of nursing staffing levels at the jail, Mr. Brack had input when he thought staffing levels were not appropriate.  (*Id.*, PageID #998, #1000 & #1001.)  Mr. Brack's formal job description anticipated that he will "[p]erform[] other job-related duties as assigned."  (ECF No. 78-10, PageID #1029.)

### III.A.2. Testimony Regarding the Meeting

Understandably, much of Mr. Brack's deposition explored his comments at the County Council's Public Safety Committee meeting and related issues under the substantive legal standards that govern his claims.

### III.A.2.a. Why Mr. Brack Attended the Meeting

Counsel for Movants elicited testimony from Mr. Brack about how he ended up attending the meeting of the County Council's Public Safety Committee:

> Q.  I think you told the FBI—you said, so he asked me to go in his place and represent the jail and represent MetroHealth.  Do you recall that?
>
> A.  I don't know if I said that, but yeah.
>
> Q.  Let me ask you:  Is that true, Dr. Tallman asked you to go in his place and represent the jail and Metro at the meeting?
>
> A.  Correct.

(ECF No. 78-10, PageID #1002.)  He went on to confirm that testimony:

44

Q.    You understand what actually happened is Dr. Tallman was requested to come and he couldn't come and asked you to go in his stead, is that fair?

A.    Yes.

(*Id.*, PageID #1004.)

### III.A.2.b. Purpose of the Meeting

Mr. Brack agreed with Dr. Tallman that the meeting was "our chance" to advise the Public Safety Committee that Mills was obstructing MetroHealth's efforts to provide adequate medical staffing at the jail:

Q.    When [Dr. Tallman] says, this is our chance to be completely transparent because Mills is so obstructive regarding our operation, "our chance" is referring to the department's chance, correct?

A.    Yes.

(*Id.*, PageID #1004.)  Further, Mr. Brack testified, over objection, that he went to the meeting "prepared to answer questions" and, without objection, that he was "willing and able, as part of [his] job at Metro, to go and answer questions."  (*Id.*)

### III.A.2.c. Mr. Brack's Capacity at the Meeting

Throughout his testimony, Mr. Brack used the first-person plural pronoun "we" multiple times, as well as its possessive variations "our" and "ours."  (ECF No. 78, PageID #851 & n.13.)  In fact, Mr. Brack confirmed at various points in his testimony that this plural usage referenced his employer.  As one example:

Q.    And you talk about here, when we have a good relationship with the sheriff. The "we," that's the department, the same way Dr. Tallman referred to that as the department, correct?

A.    Correct.

45

> Q. Throughout the meeting you use the word we, us. You are referring to the department you are in at MetroHealth, correct?
>
> A . Yes.

(ECF No. 78-10, PageID #1012.) Movants point to these instances as evidence that Mr. Brack spoke at the meeting on behalf of MetroHealth. (ECF No. 78, PageID #851.) Further, at deposition, Mr. Brack confirmed that, before the meeting, he and Dr. Tallman prepared talking points regarding MetroHealth's position on the issues that the Public Safety Committee would address at the hearing. (ECF No. 78-10, PageID #1004–05.)

Later, counsel for Movants confirmed that Mr. Brack understood that he was representing his employer at the meeting:

> Q. Dr. Tallman says you are going to represent the department. Is that the way you understood it?
>
> A. Yes.

(ECF No. 78-10, PageID #1003.) In fact, the meeting took place during the normal workday, and Mr. Brack received his normal compensation for attending:

> Q. At the time of the meeting, were you being paid by MetroHealth on the clock, so to speak?
>
> A. I would have been.
>
> Q. Normal work day as opposed to a day that you were scheduled to be off?
>
> A. Yes.
>
> Q. So while you are there, you were being compensated by MetroHealth for the time that you were there?
>
> A. Yes.

(*Id.*, PageID #1027.)

46

Additionally, Mr. Brack testified that he was instructed not to speak during the portion of the hearing dedicated to public comments, which came before the committee's questions about the jail:

> Q.　At the meeting, you saw that they initially opened it up for public comment, and no one had signed in on the public comment sheet, so they moved on?
>
> A.　I was instructed not to, yes.
>
> Q.　As you sat there in the meeting, you heard one of the members say, has anybody signed up for public comments?  And they were told no and they moved on?
>
> A.　I don't recall it, but yes, in the transcript it says yes.
>
> Q.　You understand there was a public comment portion of the meeting?
>
> A.　Yes.
>
> Q.　You spoke in a different part of the meeting?
>
> A.　Yes.

(*Id.*, PageID #1006.)

After establishing that Ms. Platten and Mr. Brack understandably had different kinds and levels of knowledge about the issues involving the jail, Mr. Brack confirmed that Ms. Platten would speak at the meeting to management and contract issues and he would address what was going on in the jail.  (*Id.*, PageID #1004.) Counsel for Movants closed out that line of questioning by confirming that Mr. Brack went to the hearing prepared to answer questions as part of his job:

> Q.　On the other hand, you were obviously going to have a much better handle on what was going on at the jail, is that right?
>
> A.　Yes.

47

Q.     And Dr. Tallman told the folks at the county that you were coming in his place and you would have that knowledge, fair?

A.     Yes.

Q.     And that knowledge would include what Mills was doing with respect to staffing?

A.     Correct.

Q.     So there were things that you could answer and things that Jane could answer, fair?

MR. CHANDRA:     Objection.

THE WITNESS:     Yes.

BY MR. KASSON:

Q.     And you went prepared to answer questions, is that right?

A.     Yes.

Q.     And you were willing and able, as part of your job at Metro, to go and answer questions, correct?

A.     Yes.

(*Id.*)

### III.A.2.d. Mr. Brack's Speech at the Hearing

Mr. Brack described what he did when he arrived at the public meeting and his understanding of his role:

Q.     When you got to the meeting what did you do?

A.     When I arrived, I met with Jane Platten.  At that time she had instructed me she would take the lead and she would speak for MetroHealth.  And if I had any—if they wanted any specific questions, I would speak and address the council.  And it was my understanding I would have to—any testimony that I gave or anything I commented on be truthful and honest.

48

(*Id.*, PageID #1006.)   Movants interpret this testimony as an instruction from Ms. Platten that Mr. Brack should be truthful and honest in his comments to the County Council (*see* ECF No. 100, PageID #1407), and the Court agrees.   Further, Ms. Platten instructed Mr. Brack to be diplomatic when answering questions:

>   Q.   And Jane told you to be diplomatic in what you said?
>
>   A.   Yes.

(ECF No. 78-10, PageID #1002.)  Mr. Brack understood this directive to mean to stick to the facts and avoid personal insults.  (*Id.*, PageID #1002–-03.)  These directives, Movants argue, directly contradict allegations in the first amended complaint that Ms. Platten ordered Mr. Brack not to speak without permission or say anything that might damage MetroHealth's relationship with the County. (*See* ECF No. 30, ¶¶ 10 & 59, PageID #182 & 192.)

Movants point to testimony that Mr. Brack responded to questions and did not volunteer information:

>   Q.   As far as I can tell, every time you spoke, you were addressing a question that had been raised.
>
>   A.   I responded to council's questions, yes.
>
>   Q.   And every time you spoke, you were responding to questions that went to your particular area of expertise, given where you worked at MetroHealth, correct?
>
>   MR. CHANDRA:   Objection.
>
>   THE WITNESS:   Yes.

(ECF No. 78-10, PageID #1006–07.)  Mr. Brack answered questions at the meeting notwithstanding Ms. Platten's direction that he stop talking.  (*Id.*, PageID #1009.)  At his deposition, Mr. Brack reaffirmed what he told the FBI about Ms. Platten's

instruction to him at the meeting not to speak further.  (*Id.*)  But the transcript of the public meeting shows that Ms. Platten asked Mr. Brack to address questions about the nursing staff after that instruction.  (ECF No. 96-2, PageID #1245–46.)

Movants contend that Mr. Brack's answers at the hearing largely track the talking points he and Dr. Tallman prepared.  (ECF No. 100, PageID #1406.) Comparison of a small portion of Mr. Brack's comments at the hearing and the talking points shows that, although Mr. Brack stuck to the talking points in some respects, he went far beyond them in others:

| Public Comments | Talking Points |
|---|---|
| "[W]e have a great relationship with Sheriff Pinkney, with the chief.  Ken Mills is kind of the obstruction in this whole process. . . . we have multiple hiring requests that were signed off by the sheriff several years ago. . . Ken Mills had the positions, contacted, I don't know if it was OBM or who he contacted, but the positions never went through so we could never hire." (ECF No. 96-2, PageID #1242.) | "For the past 2 years Mills has obstructed all attempts to increase or improve medical operations.<br>• "Vacant nurse positions not being filled-hiring request blocked/rejected (March 2017)" (ECF No. 78-10, PageID #1035.) |
| "There was a comment by Director Mills stating that talent acquisition is the problem at the jail, it's not. . . . It's clearly evident to us that there's been a nursing crisis at the jail.  The pay is definitely a factor with recruiting nurses to the jail, however, the relationship that we have with Mills, is MetroHealth is constantly left out of the planning. We had no knowledge of the prior to Bedford, prior to Euclid." (ECF No. 96-2, PageID #1243.) | "Medical staff has been purposely excluded from the planning stages of Cleveland/Bedford." (ECF No. 78-10, PageID #1036.) |

| | |
|---|---|
| "Most of the meeting that were held with MetroHealth we requested those through [others], there seems to be—it's almost a form of passive-aggressive behavior. What the Director [Mills] tells us is not what pans out.  The hiring requests we have for Euclid, those still haven't been filled.  We've had six vacancies at the county at the main jail, which we still don't have and . . . [r]eally still no staff for Bedford or Euclid at all." (ECF No. 96-2, PageID #1243.) | • "Vacant nurse positions not being filled-hiring request blocked/rejected (March 2017)"<br>• "Medical staff has been purposely excluded from the planning stages of Cleveland/Bedford."<br>(ECF No. 78-10, PageID #1036 & 1037.) |
| Q. "[M]y concern is the dollar figure, and you're saying it's not necessarily a dollar figure that's part of the problem?"<br><br>Mr. Brack: "It is a big part. . . we are not competitive with the going rates.  Our numbers that we're allowed to hire seem to constantly change.  We're told that we can hire this many and then we find out that those positions aren't available anymore.<br><br>"There's just—I think going forward, it would be great to have just more open communication, we're excluded from meetings, we're excluded just the high-level decision making that we should be included in.  Specifically, Dr. Tallman . . . is told what to do by Ken Mills, where it should be the medical director from MetroHealth should be making these decisions as they affect the inmates' health.<br><br>"Dr. Tallman should be setting the standards of what he deems appropriate for staffing, and . . . Sometimes we're told that Ken Mills runs the jail, but then sometimes we're told, 'No, you guys report to the chief.'  Then there's this interjection throughout, so it's really a | "For the past 2 years Mills has obstructed all attempts to increase or improve medical operations.<br>• "Vacant nurse positions not being filled-hiring request blocked/rejected (March 2017)<br>• "Sent emails stating there is no money in the budget for medical . . . .<br>• "Medical staff has been purposely excluded from the planning stages of Cleveland/Bedford."<br>(ECF No. 78-10, PageID #1036 & 1037.) |

| | |
|---|---|
| difficult situation to be in for MetroHealth." (ECF No. 96-2, PageID #1243.) | |

(*Compare* ECF No. 96-2, PageID #1242 *with* ECF No. 78-10, PageID #1035–36.)

### III.A.3. Testimony Regarding Mr. Brack's Job Search

After MetroHealth removed Mr. Brack from his position after the meeting, Mr. Brack testified that he sought a position with equal responsibilities, and Movants point to this testimony as evidence that he held a policy-making position. (ECF No. 78, PageID #851.) Specifically, Mr. Brack testified:

Q.  Were you interested in a nursing supervisor position, or was that something you were beyond and you want to do something else?

A.  My focus was to work in corrections. If I couldn't get that, I wanted something equal to what it was.

Q.  What would be equal to corrections if you couldn't get corrections?

MR. CHANDRA:  Objection.

THE WITNESS:  The positions I was interested in were director-level positions.

BY MR. KASSON:

Q.  That's what I'm trying to get at.

When you were working with MetroHealth to try to find a position after you left the jail, you were focused on getting a director-level position, because you had held an interim director position at the jail, is that correct?

A.  I held a position at the jail as a nursing supervisor for years, which was—I had functioned at a director's level.

Q.  Okay. So your thought was, even though your title at the jail was nursing supervisor, the types of policies, decisions you were making, policies you were implementing, the types of work you were doing were at a director-level position, is that fair?

> A.      Yes.

(ECF No. 78-10, PageID #1017–18.)  Mr. Brack expressed a preference for certain

positions, and MetroHealth planned to schedule some interviews for him:

> Q.      Take a look at Exhibit 30 and tell me when you are ready to
> discuss it.
>
> A.      Okay.
>
> Q.      It's an email chain where you indicated to folks at MetroHealth
> your first choice would be a risk management position.
>
> A.      Yes.
>
> Q.      And you told them you might consider a quality management type
> role as well, is that right?
>
> A.      Yes.
>
> Q.      And you were—they were going to schedule you for some
> interviews.  This is very shortly after you left the jail, correct?
>
> A.      Yes.

(*Id.*, PageID #1018.)   Although Mr. Brack interviewed for a position in quality

management, he did not get the job.  (*Id.*, PageID #1018–19.)  In fact, Mr. Brack

testified that he was not offered another position at MetroHealth:

> Q.      And the efforts to locate employment within the MetroHealth
> system have not been successful.  That was true?
>
> MR. CHANDRA: Objection.
>
> BY MR. KASSON:
>
> Q.      Correct?
>
> A.      I was never offered a position at MetroHealth.

(*Id.*, PageID #1026.)

### III.A.4. Additional Testimony

Beyond the testimony Movants cite, the transcript reflects an additional fact that merits a mention.  Mr. Brack reaffirmed the accuracy of his statement to the FBI:

> Q.    As you listened to the FBI interview to prepare for this deposition, you thought everything you told the FBI agents was true and accurate, fair?
>
> A.    I would say yes, that's a correct statement.

(ECF No. 96-2, PageID #1265; ECF No. 97-2, PageID #1380.)

### III.B. Further Procedural Developments

After Mr. Brack's deposition, Mills was tried and convicted in State court.  Two additional developments following the deposition of Mr. Brack bear on the motion for sanctions before the Court.

### III.B.1. Settlement Negotiations

Movants maintain that any doubt the claims against them lacked a good-faith basis was gone after Mr. Brack's deposition.  Nonetheless, they argue, Mr. Chandra sought to extort a settlement from them.  As factual support for this attitude on the part of Mr. Chandra, Movants points to the declarations he and Mr. Brack submitted. (ECF No. 96-2, ¶ 110, PageID #1225; ECF No. 97-2, ¶ 110, PageID #1340; ECF No. 96-1, ¶ 38, PageID #1203; ECF No. 97-1, ¶ 38, PageID #1318.)  Specifically, Movants view Mr. Chandra as using false allegations to pressure them into a financial settlement while knowingly pursuing a meritless suit because he and Mr. Brack sought a financial settlement from them.

To bolster their position, Movants point to the quarterly statement of their fees and costs filed pursuant to the Court's Civil Standing Order.  As of June 30, 2021, that submission reports that Plaintiff "has incurred approximately $216,385 in attorneys' fees and $2,150 in costs from The Chandra Law Firm LLC, and $22,285 in attorneys' fees" from Ms. Sletvold's new firm.  (ECF No. 64, PageID #427.)

### III.B.2. Withdrawal of Motion Against Ms. Sletvold

In May 2020, Ms. Sletvold withdrew from the Chandra Law Firm but remained counsel of record in this case along with Mr. Chandra.  (*See* ECF No. 86-1, ¶¶ 3 &13, PageID #1098–99.)  After Movants sought sanctions, Ms. Sletvold moved to withdraw as counsel for Mr. Brack.  (ECF No. 82.)  She moved "under Rule 1.16 of the Ohio Rules of Professional Conduct and based on the advice of ethics counsel" and "subject to the Court's determination of the pending sanctions motion."  (*Id.*, PageID #1079.) Less than a week later, new counsel appeared for Mr. Brack.  (ECF No. 85.)

Movants then withdrew their application for sanctions against Ms. Sletvold. (ECF No. 86.)  Movants predicate their withdrawal on certain facts Ms. Sletvold provided in a declaration:

1.  "Mr. Chandra has served as lead counsel and supervised all work performed on the matter."  (ECF No. 86-1, ¶ 4, PageID #1098.) Accordingly, Ms. Sletvold did not have decision-making authority in the case.  (*Id.*, ¶ 5.)

2.  Mr. Chandra and an associate prepared the initial complaint and performed the factual investigation and legal analysis.  (*Id.*)  Although she filed the complaint and the first amended complaint, Ms. Sletvold's

role was limited, and she relied on her partner's representations in certain important respects.  (*Id.*, ¶¶ 6 & 10, PageID #1098–99.)

3.  After Mr. Brack's deposition, counsel for Movants asked Ms. Sletvold to dismiss his clients.  She advised that she would convey that request to her client and to Mr. Chandra.  (*Id.*, ¶ 15, PageID #1099.)

4.  This request began a series of discussions with Mr. Chandra.  (*Id.*, ¶ 16, PageID #1100.)  According to her declaration, Ms. Sletvold recommended concluding "the matter quickly because the First Amendment-retaliation claim against [Movants] . . . could not be maintained in light of the testimony Nurse Brack gave during his deposition."  (*Id.*)  Mr. Chandra disagreed with this assessment.  (*Id.*)

In response to the declaration from Ms. Sletvold that Movants submitted, Mr. Chandra provided one email Ms. Sletvold sent him during Mr. Brack's deposition.  In the midst of the deposition on June 29, 2021, Ms. Sletvold wrote to Mr. Chandra: "Let's not forget that we have the continuing retaliation for subsequent media speech.  Metro can't get out of that on MSJ regardless of whether his initial speech was protected."  (ECF No. 96-2, PageID #1266; ECF No. 97-2, PageID #1381.)  Although he did not provide other emails themselves, Mr. Chandra also quoted from emails from Ms. Sletvold following Mr. Brack's deposition to show her view of the case at the time.  (ECF No. 96-2, PageID #1222–23; ECF No. 97-2, PageID #1337–38.)

He also provided internal email correspondence from MetroHealth that Movants did not provide to the Court.  One exchange between administrators at

MetroHealth took place following a news article published in December 2018 about Budish's request for MetroHealth to fire Mr. Brack.  An employee of MetroHealth sent a link to the article to the administrator to whom Dr. Tallman reported and told her, "I would bet he [Mr. Brack] leaked it.  May not be a good candidate to return." (ECF No. 96-2, PageID #1267; ECF No. 97-2, PageID #1382.)

In addition, Mr. Chandra and Mr. Brack each filed lengthy declarations.  (ECF No. 96-1, PageID #1199–1204 (Mr. Brack); ECF No. 96-2, PageID #1207–34 (Mr. Chandra); ECF No. 97-1, PageID # 1314–19 (Mr. Brack) (redacted); ECF No. 97-2, PageID #1322–49 (Mr. Chandra) (redacted).)  In the interest of avoiding or minimizing disputes of fact requiring resolution in connection with this motion, the Court does not rely on or consider these declarations except as expressly noted or referenced in this Opinion and Order.  After Movants withdrew their motion for sanctions against Ms. Sletvold, counsel appeared for Mr. Chandra.  (ECF No. 88.)  Then, new counsel for Mr. Brack appeared (ECF No. 94), as did counsel for Ms. Sletvold (ECF No. 99).

### III.C. Application of Legal Standards

Movants point to certain testimony that Mr. Brack gave at his deposition on June 29, 2021 to show that he provided these facts to Mr. Chandra as part of his pre-suit investigation some two years earlier.  That assumption is reasonable.  Notwithstanding the passage of time between Mr. Brack's statement to the FBI on June 13, 2018 and his deposition some three years later, the deposition expressly tracked much of what Mr. Brack said to the FBI in his interview.  (*See, e.g.*, ECF No. 78-10, PageID #1002.)  Though Mr. Brack's deposition provides additional facts

and details, no material discrepancy presents itself between Mr. Brack's statement to the FBI and his testimony.  Accordingly, the Court analyzes the propriety of sanctions for the filing and maintenance of suit from its outset in light of Mr. Brack's testimony.  Because, in the Court's view, Mr. Brack's deposition testimony did not differ materially from the statement he provided to the FBI, analysis of the propriety of sanctions remains largely the same.

### III.C.1. Mr. Brack's Deposition

Under the Court's inherent authority and Section 1927, the question is whether the record presents such a one-sided case that Mr. Brack had no colorable claim against MetroHealth, Dr. Boutros, or Ms. Platten.  It does not.  On the record, Plaintiff argued that at points in his public comments, he stepped out of any official role such that his public comments enjoyed First Amendment protections.  This claim might be difficult to prove in the end.  Its merits are unclear—and unresolved.  But this motion for sanctions is not an alternative vehicle to litigate those merits.  At the very least, the question is not so clear cut as Movants believe.  The Court cannot say that Mr. Chandra acted in bad faith or frivolously.

One area where Mr. Brack's deposition provides greater factual development involves the responsibilities of his position.  Movants argue that Mr. Brack served as a policymaker, depriving him of First Amendment protection for his speech at the committee hearing.  Given the factual nature of the determining whether a particular employee fills a policymaking function in the *Branti/Elrod* line of cases, they cannot show that Mr. Chandra acted in bad faith, made frivolous arguments given the record in this regard, or multiplied the proceedings, even if Movants might have prevailed

on the merits. Indeed, the record and the case law provide each side with good-faith arguments on this question, such that sanctions are not warranted.

Similarly, because multi-factor balancing tests tend to prevail over bright-line rules in this area of the law, disentangling whether Mr. Brack made any statement at the hearing in a private capacity presents an involved undertaking. Accordingly, even if Movants are correct and would have prevailed on the underlying merits, the Court cannot say that Mr. Chandra litigated in bad faith given the high standards under which Movants seek sanctions. Moreover, the contemporaneous positions MetroHealth took in June 2018 distancing itself from Mr. Brack's public statements went so far as to place his comments "outside the scope of his role." (ECF No. 30-3, PageID #232.) Particularly in light of that position, which MetroHealth took with the benefit of counsel who signed the document, Movants are hard pressed to meet the high standards for awarding sanctions.

### III.C.2. Ms. Sletvold's Withdrawal

Movants maintain that the dispute between Mr. Chandra and Mr. Brack, on the one hand, and Ms. Sletvold, on the other, "is not relevant to the pending Motion for Sanctions." (ECF No. 95, PageID #1164.) The Court agrees. As noted in the Order of April 5, 2022 (ECF No. 104), this Court is not an appropriate forum at this stage of the proceedings for resolution of disputes between a lawyer and her former client over various records or between former law partners. Construing the record in favor of Movants, and without entering into the debate between Mr. Chandra, Mr. Brack, and Ms. Sletvold over the respective assessments of the case each might have had following Mr. Brack's deposition, the record shows—at most—that two

59

lawyers might have disagreed over the assessment of or appropriate strategy in the case at a particular moment in time.

Such a disagreement, hardly remarkable among lawyers, does not merit the imposition of sanctions on the facts and circumstances of this case. Assuming for the sake of argument that, after Mr. Brack's deposition, Ms. Sletvold agreed with counsel for Movants that Plaintiff no longer had a basis for asserting claims, Mr. Chandra had a different view—one based on his knowledge of the case and the pertinent facts. Reasonable lawyers might well agree or disagree with his assessment of the merits, but those disagreements do not give rise even to an inference of bad faith conduct on Mr. Chandra's part or lead to a determination that he acted to multiply the proceedings vexatiously or otherwise.

### III.C.3. The Record as a Whole

Just as in harmless-error analysis where any claimed error might not individually require reversal but can, along with other errors, rise to a level that undermines confidence in the proceedings, so too here the Court considers the record as a whole to determine whether sanctions are warranted. Overall, the information available to Mr. Chandra throughout the life of the case did not change materially, particularly assuming that Mr. Brack communicated these facts to Mr. Chandra from the beginning. Moreover, as a whole, the record does not provide evidence from which the Court can find that Mr. Chandra acted in bad faith or otherwise engaged in behavior that merits sanctions.

Two final notes about the record as a whole. First, based on the requirement in qualified-immunity jurisprudence that a right be clearly established with sufficient

particularity in the caselaw, Movants maintain that Mr. Chandra cannot have had a good-faith basis for asserting First Amendment claims against Dr. Boutros or Ms. Platten because any argument for an extension of the law to the conduct at issue in this case would fail in the face of a qualified-immunity defense. Again, Movants seek to litigate the merits. Further, the governing principles under the First Amendment were generally well established long before the conduct giving rise to Plaintiff's suit such that reasonable lawyers can disagree in good faith about the viability of a qualified-immunity defense.

Second, to the extent Movants take issue with Mr. Chandra's pursuit of claims against Dr. Boutros and Ms. Platten individually for the termination of Mr. Brack and MetroHealth's alleged failure to re-hire him (ECF No. 100, PageID #1414–15), the record shows that, at Budish's request, Dr. Boutros took adverse employment action against Mr. Brack. Those facts provide a good-faith basis for claims against the participants in the meeting where Budish made that request. Further, those claims make, at best, a minimal difference in the case on the margins. That is, Plaintiff asserted other claims against both Dr. Boutros and Ms. Platten such that, even if those claims lacked merit, Dr. Boutros and Ms. Platten still faced other claims, brought in good faith. Those claims might or might not have survived summary judgment. At the end of the day, neither the Court nor the parties will know. But the Court cannot say that Mr. Chandra asserted these claims in bad faith or multiplied the proceedings by bringing these claims.

The record as a whole does not permit a finding that Mr. Chandra litigated in bad faith or acted vexatiously to multiply the proceedings.  He represented Mr. Brack aggressively, but within the bounds of his professional and ethical obligations.

## CONCLUSION

The Federal Rules of Civil Procedure push strongly in the direction of resolving disputes short of trial and, increasingly, without rulings on important merits issues. At times, this focus results in the resolution of a dispute too early or without enough litigation for the parties to test their respective claims and defenses and accept the result.  This is such a case.  For better and for worse, then, the parties—and, frankly, the Court—will never know whether Mr. Brack's claims had merit.  In a case such as this, which presents matters of public concern of the highest order, this result understandably leaves all involved unsatisfied.  But collateral proceedings do not provide an alternative vehicle for litigating the parties' respective positions on that question, and the Court declines to delve into them.

Based on the record presented, the Court finds that Mr. Chandra did not act in bad faith, did not unreasonably and vexatiously multiply the proceedings, and had a good-faith basis factually and legally for the claims asserted against Movants. Therefore, the Court **DENIES** the motion for sanctions (ECF No. 78).

**SO ORDERED.**

Dated:  April 21, 2022

J. Philip Calabrese
United States District Judge
Northern District of Ohio